Jacksonville Paper Company, et al. [1] v. Commissioner. Jacksonville Paper Co. v. Commissioner
Docket Nos. 14884, 14885, 14893, 14894, 106497-106500.
United States Tax Court
T.C. Memo 1954-116; 1954 Tax Ct. Memo LEXIS 136; 13 T.C.M. (CCH) 728; T.C.M. (RIA) 54223; July 30, 1954, Filed *136 1. On its income tax returns for each of the fiscal years, July 31, 1923, to June 30, 1927, and from June 30, 1929, to May 31, 1942, Jacksonville deducted amounts for salaries paid to Matthew and Clyde McGehee, and in many years to Clifford McGehee, knowing that a part of the amounts so claimed would not be and were not, in fact, salaries. Held, Jacksonville was not entitled to deductions for salaries, even though the amounts deducted might be reasonable in amount. Held, further, its returns for all of the years here in issue were fraudulently filed with intent to evade tax. 2. In 1936, 1937, and 1938, the three McGehee brothers received Jacksonville stock in proportion to their original stockholdings. The shares received by Clifford were issued by debits to Matthew's and Clyde's salary accounts. Held, the stock received was in the nature of a stock dividend, and the shares received by Clifford did not constitute taxable income to him. 3. From June 30, 1939, to May 31, 1942, Matthew and Clyde received their year-end salary checks from Jacksonville for the amount of their authorized salaries, which they had not theretofore withdrawn. All or a substantial part of the amounts *137 of such checks was paid to Clifford, who did not report the receipt of such sums on his individual tax returns. Held, Clifford's failure to report the amounts received from Matthew and Clyde was fraudulent with intent to evade tax. 4. Continental Distributing Company, a corporation, deducted the amount of $1,200 on its returns for each of the fiscal years, from June 30, 1939, to June 30, 1942, as a salary paid to its president. Continental's stockholders of record held their shares as nominees of the three McGehee brothers, Continental's real owners. Upon receipt of his salary each year, the president paid the amount thereof to the three brothers in proportion to their real ownership of Continental. The salary was authorized for him for that purpose. Held, the payment by Continental's president of the salary to the McGehee brothers was a taxable dividend to them. Held, further, Continental's returns for the years 1939 to 1942, inclusive, were fraudulently filed with intent to evade tax. 5. Clifford did not report the amounts received from Continental's president on his returns for any of the years from 1939 to 1942, inclusive, and Matthew did not report the amounts received *138 during the years 1939 to 1941, inclusive. Held, Clifford's failure to report the amounts received was fraudulent with intent to evade taxes in all such years. Held, further, Matthew's failure to report the amount received in 1939 was due to fraud with intent to evade tax. There was no deficiency in his income for 1940 or 1941. 6. Prior to 1933, Jacksonville received brokerage commissions on sales to other paper jobbers. Its brokerage activities were carried on under the name of Continental Distributing Company. It included the amounts of such commissions in its reported income. For fear of violating provisions of the National Industrial Recovery Act, the three brothers each reported one-third of Jacksonville's brokerage income on their individual returns for the years 1934, 1935, and 1936 as "other income". They claimed a partnership was formed to conduct the brokerage business during such years. Held, no valid partnership was formed to carry on Jacksonville's brokerage business, and income therefrom should have been reported by Jacksonville on its returns for the fiscal years ended June 30, 1934, to June 30, 1936, inclusive. 7. In 1936, Jacksonville's manufacturing operations, *139 including the equipment used therein together with inventories, were sold to a partnership - Southern Industries, composed of Clifford, Matthew, and Clyde who held 64.89 per cent, 32.33 per cent, and 2.78 per cent, respectively, therein. The value of the assets transferred was set up on Southern Industries' books as an account payable to Jacksonville, and the partners intended to pay for them from current profits. Held, Southern Industries was a valid partnership, formed for a business purpose. Held, further, the transfer of certain assets by Jacksonville to it did not constitute a taxable dividend from Jacksonville to the three McGehee brothers. 8. In 1938, Matthew gave his interest in Southern Industries to his wife, and Clifford gave a part of his interest to his wife and the remainder to trusts for his six children. Prior to March 31, 1938, the three brothers had reported Southern Industries' income on their individual tax returns in equal thirds, although such income was received by them according to the partnership agreement which fixed their respective interests in the partnership in proportion to their Jacksonville stockholdings. Held, Clifford failed to report his *140 full distributable share of partnership income from June 30, 1936, to June 30, 1938. He owned no interest in the partnership after June 30, 1938, and was not taxable for its income thereafter. Held, further, his failure to report his full share of such income from June 30, 1936, to March 31, 1938, was due to fraud with intent to evade tax. Held, further, Matthew owned no interest in the partnership after March 31, 1938, and was not thereafter taxable for its income. 9. In 1938, 6 life insurance policies were issued to Clifford and one to Jacksonville, on his life. Prior to the time the premiums were paid on all of the policies in 1939, Clifford irrevocably assigned his full ownership in 4 of the policies owned by him to his wife. A similar assignment of the 2 remaining policies was made in August 1939. Clifford's wife drew a "salary" from Southern Industries during each of the years 1939 to 1942, inclusive, for the purpose of paying total premiums on all 7 policies in the approximate amount of such salary. Held, premium payments made by Clifford's wife on the 4 policies owned by her after April 1939 and on the one owned by Jacksonville did not constitute taxable income to Clifford. *141 Premium payments on the 2 policies in the amount of $2,293 in 1939, prior to their assignment to her in August of that year, constituted taxable income to Clifford. Held, further, his failure to report such sums was not due to fraud with intent to evade tax. 10. Clifford received rental income from 1936 to 1942, inclusive, which he did not report on his returns for such years. He sold one piece of rental property in 1942. Held, Clifford received a net long-term capital gain from the sale of rental property in 1942 which he did not report. Held, further, his failure to report rental income was due to fraud with intent to evade tax. 11. Jacksonville's bookkeeper spent a negligible amount of time keeping the books of J. P. Realty Company from 1940 to 1942, inclusive. The Realty Company was a family corporation owned by the McGehees. Held, petitioners offered sufficient evidence to require the respondent to make a further showing that additions to Jacksonville's income during such years for the services and other alleged overhead expenses were justified. Having failed to do so, such additions are not upheld. Louis Kurz, Esq., John W. Donahoo, Esq., and William T. Rogers, Esq., for the petitioners. F. L. Van Haaften, Esq., and Ralph V. Bradbury, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion RICE, Judge: These consolidated proceedings involve the following deficiencies in taxes and penalties: Jacksonville Paper Company
Deficiency
Year Ended
Docket No.
Kind of Tax
Tax
50% Penalty
7/31/23
14884
Income
$ 1,745.41
$ 951.37
7/31/24
14884
Income
1,699.38
849.69
7/31/25
14884
Income
2,237.20
1,554.20
6/30/26
14884
Income
6,692.29
3,346.15
6/30/27
14884
Income
3,263.10
1,736.70
6/30/29
14884
Income
3,034.53
1,517.27
6/30/30
14884
Income
1,896.12
948.06
6/30/31
14884
Income
2,775.38
1,414.60
6/30/32
14884
Income
1,552.39
776.20
6/30/33
14884
Income
2,342.70
1,171.35
6/30/34
14884
Income
4,185.08
2,092.54
D.V.E.P.
1,521.85
760.93
6/30/35
14884
Income
6,768.16
3,384.08
D.V.E.P.
2,461.15
1,416.64
6/30/36
14884
Income
4,714.85
2,357.43
6/30/37
106497
Income
* 23,648.76
11,824.38
E.P.
* 2,354.85
1,177.43
6/30/38
106497
Income
* 17,495.60
8,747.80
6/30/39
106497
Income
* 15,475.27
7,737.64
E.P.
* 1,232.90
616.45
5/31/40
14884
Income
21,753.04
10,876.52
D.V.E.P.
12,869.45
6,434.73
5/31/41
14884
Income
23,701.70
11,850.85
D.V.E.P.
11,245.31
5,622.66
E.P.
636.29
318.15
5/31/42
14884
Income
39,728.27
19,864.14
D.V.E.P.
30,831.66
15,415.83
E.P.
74,585.83
37,292.92
*143 Continental Distributing Company
Deficiency
Year Ended Docket No.
Kind of Tax
Tax
50% Penalty
6/30/39
14894
Income
$ 138.76
$ 69.38
D.V.E.P.
89.89
44.95
6/30/40
14894
Income
133.87
66.94
D.V.E.P.
147.57
73.78
6/30/41
14894
Income
185.74
92.87
D.V.E.P.
162.78
81.39
6/30/42
14894
Income
147.62
73.81
D.V.E.P.
133.13
66.57
E.P.
233.60
116.80
Clifford G. McGehee
12/31/36
106498
Income
* $ 38,300.30
$ 19,150.15
12/31/37
106498
Income
* 9,742.65
4,871.33
12/31/38
106498
Income *4,664.28
2,332.14
12/31/39
106498
Income
* 14,865.17
7,432.59
12/31/40
14893
Income
32,670.70
16,335.35
12/31/41
14893
Income
40,293.20
20,146.60
12/31/42
14893
Income
102,196.32
51,098.16
Matthew R. McGehee
12/31/36
106499
Income
$ 12,650.98
0
12/31/38
106499
Income
619.16
0
12/31/39
14885
Income
3,656.74
$ 1,830.98
12/31/40
14885
Income
7,488.05
3,744.02
12/31/41
14885
Income
8,865.03
4,432.52
Clyde C. McGehee
12/31/36
106500
Income
$ 136.45
0
*144 The issues to be determined are: (1) was Jacksonville Paper Company entitled to deductions of salaries for officer-stockholders on its returns for the fiscal years ended July 31, 1923, to June 30, 1927, inclusive, and from June 30, 1929, to May 31, 1942; and (2) if not, were such deductions fraudulently claimed with intent to evade tax; (3) did Clifford G. McGehee receive additional taxable income by credits to his capital stock account of certain undrawn amounts of salary authorized for his two brothers for the years 1936 to 1938, inclusive; (4) did Clifford G. McGehee fraudulently fail to report, with intent to evade tax, amounts of his two brothers' Jacksonville salaries, paid by them to him in the years 1939 to 1942, inclusive; (5) was $1,200 deducted on its returns by Continental Distributing Company, a corporation, as salary paid to its president, A. S. Reinoehl, a taxable dividend to certain officer-stockholders of Jacksonville Paper Company for the fiscal years ended June 30, 1939, to June 30, 1942, inclusive; and (6) if so, was such deduction fraudulently claimed with intent to evade tax; (7) did Clifford G. McGehee fraudulently fail to report, with intent to evade tax, *145 a part of A. S. Reinoehl's salary from Continental Distributing Company, which Reinoehl paid to him during the years 1939 to 1942, inclusive; (8) did Matthew R. McGehee fraudulently fail to report, with intent to evade tax, a part of A. S. Reinoehl's salary from Continental Distributing Company, which Reinoehl paid to him during the years 1939 to 1941, inclusive; (9) should the net income of Jacksonville Paper Company for the fiscal years June 30, 1934, to June 30, 1936, inclusive, have included the net income of the Continental Distributing Company, an alleged partnership; (10) should the net income of Jacksonville Paper Company for the fiscal years June 30, 1937, to May 31, 1942, inclusive, have included the net income of Southern Industries Company, an alleged partnership; (11) if not, did the transfer of certain of the assets of the Jacksonville Paper Company to Southern Industries Company, upon its formation in 1936, constitute a taxable dividend to Clifford, Matthew, and Clyde McGehee in proportion to their stockholdings in the Jacksonville Paper Company; (12) did Cliford G. McGehee fail to report his full distributive share of partnership income from Southern Industries for *146 the years 1937 to 1942, inclusive; and (13) if so, was his failure to so report his distributive share for the years 1937 and 1938 due to fraud with intent to evade tax; (14) did Matthew R. McGehee fail to report his full distributive share of partnership income from Southern Industries for the years 1939 to 1941, inclusive; (15) did Clifford G. McGehee fraudulently fail to report, with intent to evade tax, amounts paid as salary to his wife by Southern Industries and used to pay premiums on insurance on his life during the years 1939 to 1942, inclusive; (16) did Clifford G. McGehee fail to report capital gain from the sale of certain rental property in 1942, and did he fraudulently fail to report, with intent to evade tax, rental income received during the years 1936 to 1942, inclusive; (17) should the income of the Jacksonville Paper Company for its fiscal years ended May 31, 1940, to May 31, 1942, inclusive, have included the amounts of $550, $600, and $600, respectively, as being the pro rata portion of the administrative, bookkeeping, and overhead expenses which should have been charged to the J. P. Realty Company. The parties have stipulated their agreement to certain adjustments *147 in the deficiency notices which were originally in issue. Other issues have been conceded or are deemed to be admitted for failure to offer evidence, with respect thereto, sufficient to rebut the presumptive correctness of respondent's determination. Such agreement, concessions, and admissions will be taken into account under a Rule 50 computation. The respondent concedes that if the returns of the Jacksonville Paper Company, for the years 1923 to 1936, inclusive, were not fraudulently filed with intent to evade tax, the assessments and collection of any deficiencies due to adjustments in those years, in Docket No. 14884, are barred by the statute of limitation. General Findings of Fact The returns for all of the petitioners during all the years here in issue were filed with the collector of internal revenue for the district of Florida. These proceedings concern numerous adjustments to tax returns filed by three brothers - Clifford G., Matthew R., and Clyde C. McGehee - and by corporations and partnerships of which they were the dominant stockholders and partners. Clifford G. McGehee (hereinafter referred to as Clifford) was married to Ray Sutton McGehee; they were the parents *148 of six children. Matthew R. McGehee (hereinafter referred to as Matthew) was married to Delia C. McGehee; they had no children. Clyde C. McGehee (hereinafter referred to as Clyde) was married and the father of six children. The revenue agents commenced their investigation leading to the assertion of deficiencies and penalties here in issue on March 20, 1940. Findings of Fact Issues 1, 2, 3, 4, 5, 6, 7, 8, and 9 Jacksonville Paper Company - Stockholder-Officers' Salary Deductions The Jacksonville Paper Company (hereinafter referrec to as Jacksonville or as the corporation) was incorporated under the laws of the State of Florida on April 24, 1919. Its books and records were kept on the accrual basis for fiscal years ending July 31, 1923, to July 31, 1925; June 30, 1926, to June 30, 1939; and May 31, 1940, to May 31, 1942; and its tax returns were filed on such basis. Jacksonville's principal business during all such years was the jobbing of paper products. The corporation's main offices were located in Jacksonville, Florida. It operated branch warehouses under various trade names in other cities in Florida, Georgia, and Alabama. In 1925, in addition to its paper jobbing, *149 Jacksonville began manufacturing brooms; in 1931, coat hangers; in 1932, paper bags; and in 1935, envelopes. All manufacturing operations were carried on at premises separate and apart from the main offices and plant of the corporation. Branches of Jacksonville located in other cities were complete operating units, including warehouse facilities, sales and office staffs with a branch manager in charge. The branches did no manufacturing. During all the years here in question, Clifford was president of Jacksonville; Matthew, secretary-treasurer; and Clyde, vice-president. Clifford and Matthew signed each of Jacksonville's tax returns for all of the years here in issue except 1938, when Clifford and Clyde signed the return. From the organization of the corporation, Clifford was always its major stockholder and the dominant personality in charge of all purchasing, production, and sales. He set the prices at which merchandise was sold by Jacksonville, and did a large part of the selling personally. Neither Matthew nor Clyde was ever concerned with either purchasing or sales activities. Matthew was in charge of the office force of the corporation; and, in the early years, personally, *150 kept its books and records. He was always the custodian of stock-certificate books and other allied records. Clyde's only duty with Jacksonville was the supervision of receiving and shipping of merchandise in the warehouse. His office was located there. He never knew what his exact stock interest in the corporation was; had no voice in the determination of officers' salaries; and generally, knew little about operations of the corporation except for the warehouse, of which he was in charge. On April 24, 1919, when Jacksonville was incorporated, its authorized stock was 500 common shares of $100 par value each. At no time during the years before us did the corporation have any class of stock other than common. On August 1, 1919, 250 shares of the authorized capital stock were issued; 167 were issued to Clifford and 83 to Matthew, thus making the paid-in capital $25,000. On August 2, 1920, 28 shares of capital stock were issued to Clifford, 15 shares to Matthew, and 7 shares to Clyde. The issuance of these shares gave the three brothers the following percentage of stock ownership in the corporation: Clifford
65.00%
Matthew
32.67%
Clyde
2.33%
100.00%
On August 2, 1922, 22 *151 shares of capital stock were issued to Clifford, 11 shares to Matthew, and 2 shares to Clyde. These additional shares changed the percentage of stock ownership, as follows: Clifford
64.78%
Matthew
32.54%
Clyde
2.68%
100.00%
Except for a negligible number of special shares held by one J. R. Williford, Jr., the manager of the corporation's Tampa Branch, the three McGehee brothers were the only stockholders of the corporation during all of the fiscal years from 1923 to 1938, inclusive. During all the years here in issue, the three McGehee brothers were the only directors of the corporation. They authorized their own salaries as its officers at the beginning of each fiscal year. In 1923, Clifford and his brothers decided that capital stock would be issued to them by debits against the amounts of their authorized salaries, which they did not withdraw each year, and that such stock of the corporation would be owned by them in the percentages prevailing on August 2, 1922. They agreed further, however, that all shares would be held in their joint names; and pursuant to such plan, on August 2, 1923, all stock certificates theretofore issued were canceled. One qualifying *152 share was then issued to each of the three brothers, and 497 shares were issued in their joint names. The stock-certificate book began with Certificate No. 1, and showed the first 3 shares to be held, one each by Clifford, Matthew, and Clyde. All other shares were jointly held. The original ledger sheet showing stock ownership in the ratio as of August 2, 1922, was not shown to employees of respondent until sometime in 1944. During each of the years, from 1923 to 1938, inclusive, the three brothers had separate drawing accounts on Jacksonville's books to which their respective salaries were credited at the end of the fiscal year. Salary checks were not regularly issued. At the end of each fiscal year except 1928, the unused balances in the drawing accounts were combined in one general entry, and credited directly to the capital stock account. Stock was issued therefor by joint certificates at its par value of $100 per share. All of the amounts authorized and credited to the brothers' drawing accounts were deducted as salaries on the tax returns filed by Jacksonville. To provide the necessary shares which were issued pursuant to the above-described plan, Jacksonville secured amendments *153 to its charter increasing the number of its authorized shares, as follows: Number
Date
of Shares
8/11/24
2,000
3/ 5/31
5,000
2/25/37
10,000
In 1942, Jacksonville was reincorporated under the Florida general corporation laws of 1925, with authorized capital stock of 25,000 common shares of $100 par value each. Set forth below for each of the years 1923 to 1938, inclusive, are the amounts of salary deducted by Jacksonville on its income tax returns for each brother; the amounts actually withdrawn by each; the balances not withdrawn, for which stock was issued; and the percentage which the undrawn balances represent of salary deducted: Clifford G. McGehee
(Column A)
(Column B)
(Column C)
Percentage
Salary Deducted
which
by Jacksonville
Column C
Fiscal Year
on Income
Not
Is of
Ended
Tax Returns
Withdrawn
Withdrawn
Column A
7/31/23 **
$ 7,600.00
0
0
7/31/24 **
9,000.00
0
0
7/31/25
11,166.67
$ 6,250.00
$ 4,916.67
44.0
6/30/26
22,366.63
6,548.88
15,817.75
70.7
6/30/27
18,000.00
12,637.07
5,362.93
29.8
6/30/28 (Not in issue)
6/30/29
18,000.00
9,659.90
8,340.10
46.3
6/30/30
16,000.00
11,467.84
4,532.16
28.3
6/30/31
16,000.00
11,099.47
4,900.53
30.6
6/30/32
14,000.00
10,627.43
3,372.57
24.1
6/30/33
14,000.00
9,342.63
4,656.37
33.3
6/30/34
14,000.00
14,000.00
0
6/30/35
16,000.00
15,497.09
502.91
3.2
6/30/36
16,000.00
13,781.08
2,218.92
13.8
6/30/37
20,000.00
20,000.00
0
6/30/38
20,000.00
20,000.00
0
$ 54,620.91
Matthew R. McGehee
7/31/23 **
$ 7,600.00
0
0
7/31/24 **
9,000.00
0
0
7/31/25
11,166.67
$ 2,052.44
$ 9,114.23
81.6
6/30/26
22,366.63
5,660.34
16,706.29
74.7
6/30/27
18,000.00
9,643.74
8,356.26
46.4
6/30/28 (Not in issue)
6/30/29
15,000.00
7,596.60
7,403.40
49.4
6/30/30
14,000.00
7,701.35
6,298.65
45.0
6/30/31
14,000.00
6,580.17
7,419.83
53.0
6/30/32
12,000.00
6,149.84
5,850.16
48.8
6/30/33
12,000.00
6,414.65
5,585.35
46.5
6/30/34
12,000.00
9,755.16
2,244.84
18.7
6/30/35
14,000.00
10,186.60
3,813.40
27.2
6/30/36
14,000.00
10,368.98
3,631.02
25.9
6/30/37
18,000.00
11,403.62
6,596.38
36.6
6/30/38
18,000.00
13,982.98
4,017.02
22.3
$ 87,036.83
Clyde C. McGehee
7/31/23 **
$ 6,400.00
0
0
7/31/24 **
7,500.00
0
0
7/31/25
8,750.00
$ 1,711.82
$ 7,038.18
80.4
6/30/26
17,270.00
1,364.01
15,905.99
92.1
6/30/27
12,600.00
4,148.05
8,451.95
67.1
6/30/28 (Not in issue)
6/30/29
12,000.00
4,129.65
7,870.35
65.6
6/30/30
12,000.00
4,371.85
7,628.15
63.6
6/30/31
12,000.00
4,192.15
7,807.85
65.1
6/30/32
10,000.00
4,071.52
5,928.48
59.3
6/30/33
10,000.00
4,052.75 *
5,948.25 *
59.5
6/30/34
10,000.00
4,838.91
5,161.09
51.6
6/30/35
12,000.00
6,295.83
5,704.17
47.5
6/30/36
12,000.00
8,147.19
3,852.81
32.1
6/30/37
16,000.00
8,140.29
7,859.71
49.1
6/30/38
16,000.00
11,471.00
4,529.00
28.3
$ 93,685.98
*154 Outstanding capital stock of the corporation on June 30, 1938, had increased to $800,000. Of this amount $266,843.72 resulted from application of the brothers' undrawn salaries to the issuance of capital stock from 1923 to 1938, inclusive. Additional increases in outstanding stock, all held by the three McGehee brothers, resulted from charges to surplus and from transfers of funds from other sources to be hereinafter described. Outstanding capital stock of the corporation increased in part each year by exactly the total amount of salaries which the three brothers did not withdraw, as follows: Total Amount of
Undrawn Salaries
and Amount of
Fiscal Year
Increase in Out-
Ended
standing Capital Stock
7/31/23
$ 16,500.00 *
7/31/24
15,000.00 *
7/31/25
21,069.08
6/30/26
48,430.03
6/30/27
22,171.14
6/30/28 (Not in issue)
6/30/29
23,613.85
6/30/30
18,458.96
6/30/31
20,128.21
6/30/32
15,151.21
6/30/33
16,189.97
6/30/34
7,405.93
6/30/35
10,020.48
6/30/36
9,702.75
6/30/37
14,456.09
6/30/38
8,546.02
Total
$ 266,843.72
*155 In 1938, Matthew became seriously ill; and, at that time, he and Clifford decided that it would be advantageous to have the outstanding shares of capital stock, then held in the joint names of the three brothers, canceled and reissued according to their actual proportionate ownership of the corporation. Matthew and Clifford also decided that, upon the distribution of the jointly-held Jacksonville stock, they would give a part of their stock to their respective wives, Delia C. McGehee and Ray S. McGehee. Clifford also desired to establish a trust for each of his six children, with Jacksonville stock as the corpus. Although the reissuance of the stock was ostensibly as of June 30, 1938, the actual shares were not canceled and reissued until the Fall of that year. The 8,000 outstanding shares were canceled and reissued as follows: No. of Shares
Clifford
3,320
Matthew
1,640
Clyde
240
Delia C. McGehee
1,000
Ray S. McGehee
300
Trustees of 6 trusts (1 for each of
Clifford's six children)
1,500
8,000
*156 Ray S. McGehee and Matthew were the trustees for the children. Clifford and Matthew filed gift tax returns showing the shares donated to their wives and the trusts, and paid taxes thereon. The three brothers decided at that time, at the suggestion of the accountant who handled the corporation's tax returns, that they would make a minor change in the proportionate ownership of Jacksonville's stock in order to eliminate fractions of a per cent. Thus, following the distribution above-indicated, Clifford and members of his family held 5,120 shares, representing 64 per cent of the outstanding stock; Matthew and his wife held 2,640 shares, representing 33 per cent of the outstanding stock; and Clyde held 240 shares, representing 3 per cent of the outstanding stock. From 1923 to 1938, inclusive, the total undrawn salaries of the three brothers, against which jointly-held stock was issued, were as follows: Clifford
$ 54,620.91
Matthew
87,036.83
Clyde
93,685.98
Unsegregated salaries for fiscal
years 1923 and 1924
31,500.00
$ 266,843.72
On the basis of the percentage of distribution used in 1938 to divide the jointlyheld shares, exclusive of the unsegregated salaries *157 for the years 1923 and 1924, Clifford and his family received $95,999.07 more stock than the amount of his own undrawn salary from 1923 to 1938; Matthew and his wife received $9,373.40 less stock than his undrawn salary during that period; and Clyde received $86,625.67 less than the amount of his undrawn salary. No gift tax returns were filed by Matthew or Clyde showing a gift to Clifford of the amounts of their undrawn salaries which he eventually received upon the stock distribution in 1938. Clyde's and Matthew's income tax returns also show no sales of stock to Clifford. Even though all outstanding shares of stock were held by the individual owners after 1938, the three brother continued the same basic plan of distributing their undrawn salaries for the remaining taxable years before us, 1939 to 1942, inclusive. The operation of the plan, however, was changed from mere book entries which had been used in the previous years. At the close of the taxable years ending June 30, 1939, to May 31, 1942, inclusive, Matthew and Clyde received year-end salary checks from Jacksonville for the "undrawn" amounts of their authorized salaries. Clifford, in each of those years, substantially *158 overdrew his authorized salary. Matthew and Clyde deposited such checks in their personal bank accounts. Pursuant to the three brothers' agreement, Matthew and Clyde then issued their personal checks to Clifford, and Clyde issued his personal check to Matthew, dividing the total amount of their year-end salary checks on the basis of the three brothers' 1938 proportionate stock ownership in the corporation: 64% to Clifford, 33% to Matthew, 3% to Clyde In 1941, a substantial overdraft in Clifford's account was first satisfied by Matthew and Clyde from their checks, and the balance thereof was then distributed according to the ratio of stock ownership. In 1942, Clifford received all of Matthew's and Clyde's year-end salary checks. Set forth below are the salaries deducted by Jacksonville on its Federal income tax returns for each of the years 1939 to 1942, inclusive; the amounts which the brothers had withdrawn by the end of the year; the amounts by which Clifford had overdrawn his authorized salary; and the amounts which Matthew and Clyde received as year-end salary checks: Fiscal
Year
Clifford G.
Matthew R.
Clyde C.
Ended
McGehee
McGehee
McGehee
6/30/39
Salary deducted by Jacksonville
$ 20,000.00
$ 18,000.00
$ 16,000.00
Withdrawn before end of year
25,525.78
15,947.49
11,959.23
Overdrawn or received as year-end check
($ 5,525.78)
$ 2,052.51
$ 4,040.77
5/31/40
Salary deducted by Jacksonville
$ 20,833.34
$ 17,333.34
$ 14,666.67
Withdrawn before end of year
23,678.66
11,048.80
9,908.06
Overdrawn or received as year-end check
($ 2,845.32)
$ 6,284.54
$ 4,758.61
5/31/41
Salary deducted by Jacksonville
$ 26,000.00
$ 20,000.00
$ 16,000.00
Withdrawn before end of year
33,917.48
13,925.34
10,689.24
Overdrawn or received as year-end check
($ 7,917.48)
$ 6,074.66
$ 5,310.76
5/31/42
Salary deducted by Jacksonville
$ 33,000.00
$ 20,000.00
$ 16,000.00
Withdrawn before end of year
39,342.76
17,316.39
12,016.74
Overdrawn or received as year-end check
($ 6,342.76)
$ 2,683.61
$ 3,983.26
*159 Set forth below are the year-end salary checks received by Matthew and Clyde for each of the fiscal years from 1939 to 1942, inclusive; the final distribution of the total amount of those checks which were distributed to Clifford by their personal checks; and the percentage which the amount each brother finally received represented of the total of Matthew's and Clyde's year-end salary checks: Fiscal
Year
Clifford G.
Matthew R.
Clyde C.
Ended
McGehee
McGehee
McGehee
Total
6/30/39
Salary checks received
0
$ 2,052.51
$ 4,040.77
$ 6,093.28
Ultimate proceeds received
$ 3,960.63
2,132.65
0
6,093.28
Percentage of total proceeds received
65%
35%
0
5/31/40
Salary checks received
0
$ 6,284.54
$ 4,758.61
$ 11,043.15
Ultimate proceeds received
$ 7,068.03
3,643.86
331.26
11,043.15
Percentage of total proceeds received
64%
33%
3%
5/31/41
Salary checks received
0
$ 6,074.66
$ 5,310.76
$ 11,385.42
Ultimate proceeds received *
$ 10,136.95
1,144.42
104.05
11,385.42
Percentage of total proceeds received
64%
33%
3%
5/31/42
Salary checks received
0
$ 2,683.61
$ 3,983.26
$ 6,666.87
Ultimate proceeds received
$ 6,666.87
0
0
6,666.87
Percentage of total proceeds received
100%
0
0
*160 Matthew or A. S. Reinoehl, Jacksonville's auditor, prepared Clyde's personal checks which he signed to effect the above-described disbursements. The deposit tickets of Jacksonville involved int he year-end salary distributions were not with the bound deposit tickets of the company, and were not located for respondent's agents during their investigation. Clifford and Matthew did not produce their canceled checks or bank statements for the investigating agents. They produced their check stubs, but there was no notation thereon with reference to the salary distribution. Clyde produced his canceled checks and bank statements for all months except those in which the salary distribution occurred. Generally, after the exchange of their personal checks, the three brothers paid the amounts ultimately received to Jacksonville and received stock therefor. In 1939, however, the amounts which Clifford and Matthew received were deposited by Jacksonville, but eventually these sums were *161 reflected as credit balances on the brothers' drawing accounts in Southern Industries. In the year 1942, when Matthew and Clyde received nothing, $6,342.76 of the amount which Clifford received from them was paid to Jacksonville and credited against the deficit balance of that amount on Clifford's personal account. Thus, of the total amount of $35,188.72 of Matthew's and Clyde's year-end salary checks from 1939 to 1942, Clifford received $27,832.48; Matthew received $6,920.93 - $10,174.39 less than he contributed to the pool; Clyde received $435.31 - $17,658.09 less than he contributed to the pool. During all of the years here in issue, the three brothers reported on their own individual returns only the amounts of salary authorized by the corporation. The individual taxes were paid by charges to their respective personal drawing accounts on Jacksonville's books. Jacksonville never declared a dividend of any kind. On its returns for the years 1923 to 1938, it reported its stock as jointly owned. Thereafter, it did not indicate how the stock was held. Set forth below is the corporation's income each year as shown on its returns before deductions for the three brothers' salaries, *162 the amounts deducted for salaries, and the per cent of income which the salaries represent: A
B
Fiscal
Income be-
Salaries
Per cent
year
fore salary
for the
which
ended
deductions
3 brothers
B is of A
7/31/23
$ 22,147.54
$ 21,600.00
97.5
7/31/24
26,499.23
25,500.00
96.2
7/31/25
48,136.23
31,083.34
64.6
6/30/26
70,038.93
62,003.26
88.5
6/30/27
63,900.79
48,600.00
76.1
6/30/28 (Not
in issue)
6/30/29
48,243.29
45,000.00
93.3
6/30/30
41,481.74
42,000.00
101.2
6/30/31
50,003.30
42,000.00
84.0
6/30/32
34,304.18
36,000.00
104.9
6/30/33
62,323.31
36,000.00
57.7
6/30/34
116,549.23
36,000.00
30.9
6/30/35
124,442.42
42,000.00
33.8
6/30/36
92,303.74
42,000.00
45.5
6/300/37
98,810.21
54,000.00
54.7
6/30/38
86,742.24
54,000.00
62.3
6/30/39
78,244.44
54,000.00
69.0
5/31/40
131,153.18
52,833.35
40.3
5/31/41
158,941.93
62,000.00
39.0
5/31/42
267,619.25
69,000.00
25.8
The undrawn amounts of salaries from 1923 to 1938, inclusive, could be converted only to stock. The brothers had no election to receive such amounts in any other form. Respondent determined that the undrawn portions of *163 the three brothers' salaries for each of the years here in issue were improper deductions by Jacksonville, and that its returns for all such years were fraudulently filed with intent to evade tax. Respondent further determined that Clifford received additional taxable income of: $3,990.84 in 1936, $9,251.90 in 1937, and $5,425.23 in 1938, such sums being the amounts of Matthew's and Clyde's undrawn salaries for those years for which stock was issued to Clifford. Respondent also determined that the amounts of Matthew's and Clyde's year-end salary checks which Clifford received from 1939 to 1942, inclusive, were additional income to him, and that his failure to report such sums was due to fraud with intent to evade tax. During each of the fiscal years from July 31, 1923, to June 30, 1927, inclusive, and from June 30, 1929, to May 31, 1942, inclusive, that part of the amounts claimed by Jacksonville as salaries paid to the three McGehee brothers, which they did not withdraw, and the amounts of the year-end checks issued to Matthew and Clyde were, in fact, a distribution of profits to them in each of those years. The corporation's returns for all such years were fraudulently filed *164 with intent to evade tax. Clifford received additional income in the amount of his two brothers' year-end salary checks which he received, and his failure to report such sums was due to fraud with intent to evade tax. Continental Distributing Company - Partnership Prior to 1933, Jacksonville acted as a broker for various paper mills, in sales to other jobbers like itself, for which it received brokerage commissions. Since many of the jobbers were competitors, it carried on its brokerage activities in the name of Continental Distributing Company (hereinafter referred to as Continental). All income from such sales was reported together with other income by Jacksonville on its Federal income tax returns. The National Industrial Recovery Act [1] became law on June 16, 1933. For fear of violating certain provisions thereof, Clifford decided that thenceforth all brokerage commissions which Jacksonville earned would not be reported by Jacksonville but would be reported in equal thirds by the three brothers on their individual income tax returns, as if Continental were a partnership in which each owned a one-third interest. No partnership agreement was ever executed; no capital was contributed *165 to the alleged partnership by Clifford, Matthew, and Clyde; it maintained no bank account; no partnership information returns were ever filed; and, while the three brothers, for the years 1933 to 1936, inclusive, reported the brokerage income on their individual returns filed on the calendar-year basis, they classified such income there shown simply as "other income" and not as the income from a partnership. During the years 1933 to 1936, the only record maintained of this brokerage income was a joint ledger account on Jacksonville's books in the names of the three brothers. No charges were made against the joint account. The only debit items therein were brokerage adjustments. One Sparks Jones was employed by Jacksonville during the years 1933 to 1936, inclusive, for the primary purpose of carrying on its brokerage activities in the name of Continental. Jones' salary, as well as all other expenses connected with brokerage sales, was charged to and paid for by Jacksonville. Of the total profits from Continental's brokerage commissions reflected in the joint account during the years from June 30, 1934, to June 30, 1936, $61,486.34 was used to purchase Jacksonville *166 stock issued jointly to the three brothers. The balance of the brokerage profits was transferred to other accounts, such as "Beach House", etc., belonging to Clifford and Matthew. Hence, while Clyde reported one-third of the brokerage profits during such period in the amount of $28,633.51, the only amount which he actually received was $1,844.59 of Jacksonville stock included in the 3 per cent of such stock which he received in the redistribution in 1938. Respondent determined that brokerage income from Continental in the following amounts should have been included in the income of Jacksonville for each of the fiscal years ended June 30, 1934, 1935, and 1936: 6/30/34
$ 23,030.99
6/30/35
39,202.48
6/30/36
24,587.04
Continental Distributing Company - Corporation The Robinson-Patman Act [2] became law on June 19, 1936. Because of Clifford's fear that the method of reporting brokerage income theretofore used would violate provisions of this law, Continental was incorporated under the laws of the State of Florida on October 9, 1936. For the taxable years ending June 30, 1939, to June 30, 1942, it kept its books on the accrual basis of accounting. *167 On October 10, 1936, Continental issued 10 shares of its $100 par value common stock as follows: Number of Shares
A. S. Reinoehl
7
Louis Kurz
2
Sparks Jones
1 The shares issued to Kurz were qualifying shares, and no delivery thereof was made to him nor was delivery made to Sparks Jones of his one share. All outstanding stock certificates of Continental, during the years 1936 to 1942, inclusive, were kept in Jacksonville's safe. A. S. Reinoehl (hereinafter referred to as Reinoehl) was Jacksonville's auditor; Louis Kurz was its attorney; and Sparks Jones (hereinafter referred to as Jones) was a Jacksonville employee whose primary duty was making brokerage sales. The only paid-in capital with which Continental began business was a $1,000 check issued to it by Jacksonville, and charged on Jacksonville's books equally to Clifford and Matthew. The minutes of the first directors' meeting of Continental, held on October 10, 1936, show that Reinoehl was to be its president and treasurer, and Jones its vicepresident and secretary. Matthew was to manage the business. The minutes also show that Jones was elected chairman of its board. He, in fact, never attended *168 a stockholders' meeting or knew that he was a director of the company. He never paid for his one share of stock; and upon the termination of his employment on October 1, 1938, his stock certificate was canceled and reissued in the name of Charles H. Threlkeld, Jacksonville's cashier. Threlkeld did not pay for the one share of stock issued in his name during the years here in question. While Continental had a nominal president and while Matthew was ostensibly responsible for the management of the company, Clifford, in fact, was the person who directed the activities of Jones, Continental's only real employee. Clifford set Jones' salary, gave him the prices he was to quote, and outlined his traveling itinerary. On December 3, 1936, Matthew opened a bank account for Continental. He and Clifford were the only persons authorized to draw checks on the account. Reinoehl was not authorized to draw checks on the account until September 1944, long after the investigation resulting in the deficiencies herein had begun. Prior to 1939, Continental claimed no deductions for officers' salaries on its returns. At a directors' meeting, held on August 8, 1938, a resolution was adopted, providing *169 for payment of $100 per month to Reinoehl as president. The resolution also authorized payment to Jacksonville of $225 per month for Matthew's services as manager of Continental. No cash payments for Matthew's alleged services were actually made, but the books of Continental and Jacksonville show annual adjustments to reflect such payments at the end of each fiscal year, and Continental took a deduction captioned "administration expenses" of $2,700 on its income tax returns each year thereafter, to reflect such alleged services. After deductions for social security taxes for each of the years 1939 to 1942, inclusive, Continental issued checks in the following amounts to Reinoehl in payment of his salary: Fiscal Year Ended
Amount of Check
6/30/39
$ 1,188.00
5/31/40
1,089.00
5/31/41
1,188.00
5/31/42
1,188.00 It claimed a $1,200 salary deduction on its Federal income tax returns as salary paid to Reinoehl for each of the years 1939 to 1942, inclusive. Continental did not have sufficient funds in its bank account to pay Reinoehl's first salary check in 1939. Jacksonville drew its check, payable to Continental, in the amount of $1,188 on June 30, 1939. Upon *170 receipt of his salary check each year, Reinoehl deposited it in his personal bank account, and thereupon drew his personal checks payable to Clifford, Matthew, and Clyde in the approximate ratio of their stockholdings in Jacksonville - 64 per cent, 33 per cent, and 3 per cent, respectively, as set forth below: Amount of
Reinoehl's
Amount
Amount
Amount
Salary
Paid to
Per
Paid to
Per
Paid to
Per
Year
Check
Clifford
Cent
Matthew
Cent
Clyde
Cent
1939
$ 1,188.00
$ 772.20
65%
$ 415.80
35%
0
0
1940
1,089.00
696.96
64%
359.37
33%
$ 32.67
3%
1941
1,188.00
760.32
64%
392.04
33%
35.64
3%
1942 *
1,188.00
1,042.57
100%
Reinoehl's tax liability for 1939 was $38.02. On March 12, 1940, $38 from an unidentified source was deposited in his bank account. The normal tax in 1940 on $1,200 was $48; and, on March 7, 1941, Reinoehl deposited $48 in currency in his bank account. Reinoehl made the payments to the McGehee brothers on the same day that Matthew and Clyde paid a part or all of their year-end Jacksonville *171 salary checks to Clifford. Reinoehl did not produce his canceled checks or bank statements reflecting the so-called salary payments for the investigating revenue agents. Although Continental was a profitable business during the years 1939 to 1942, inclusive, it paid no dividends as such. On its income tax returns for the fiscal years ending June 30, 1940, 1941, and 1942, it showed the following surplus: Year
Amount
6/30/40
$ 4,222.96
6/30/41
7,745.00
6/30/42
14,206.93
At a stockholders' meeting on May 15, 1940, it was agreed that the company's surplus thereafter should be loaned to Southern Industries (to be hereinafter described) on demand notes bearing interest at the rate of 4 per cent. Pursuant to such agreement, the following loans were made to Southern Industries, none of which was repaid: Date of
Amount of
Loan
Loan
Loan
Balance
5/31/40
$ 5,536.95
$ 5,536.95
5/31/41
3,500.00
9,036.95
12/31/41
5,000.00
14,036.95
5/30/42
4,000.00
18,036.95 With the exception of $500 of the last loan shown above, Southern Industries paid the proceeds of all loans received from Continental to Jacksonville. During this same period, Reinoehl *172 owed money to banks on which he was paying 6 to 8 per cent interest. On November 1, 1940, Reinoehl executed a note in the amount of $1,000, at 6 per cent interest, payable to Clifford and Matthew. In April 1944, Continental declared its first dividend in the amount of $1,600 to Reinoehl. On May 13, 1944, Reinoehl paid the $1,000 note, together with $50 interest for one year, to Clifford and Matthew equally. Respondent determined that the amounts distributed to the three McGehee brothers by Reinoehl were dividends to them as the real owners of the corporation, and that Continenta's deduction for a salary paid to Reinoehl each year was fraudulent with intent to evade tax. He further determined that Clifford's and Matthew's failure to report the amounts received from Reinoehl was fraudulent with intent to evade tax. Continental was at all times owned by the McGehee brothers, and its returns for the years 1939 to 1942, inclusive, were fraudulently filed with intent to evade tax. Clifford's failure to report the amounts received from Reinoehl for all such years was fraudulent with intent to evade tax, and Matthew's failure to report the amount received in 1939 was fraudulent with *173 intent to evade tax. Opinion Issues 1, 2, 3, 4, 5, 6, 7, and 8. Fraud: Jacksonville Paper Company - Deductions for Officer-Stockholders' Salaries. Continental Distributing Company - A Corporation. Clifford G. McGehee - Matthew R. McGehee. The respondent concedes that absent a showing of the filing of fraudulent returns with intent to evade tax, assessment and collection of the deficiencies asserted in Docket No. 14884 against petitioner, Jacksonville Paper Company, for the years 1923 to 1927, inclusive, and 1929 to 1936, inclusive, are barred by the statute of limitations. Respondent asserted the fraud penalty against Jacksonville for all of the years here in issue upon his determination that it had deducted on its returns amounts as salaries paid to the three McGehee brothers, when, in fact, a part of such acounts so claimed each year was a distribution of corporate profits as a dividend. He argues that Jacksonville's deduction of salaries for the three brothers during the years 1923 to 1938, which were not withdrawn but against which jointly-held stock was issued but later distributed in approximately the original ratio of ownership, and its deduction of salaries *174 for the years 1939 to 1942 for Matthew and Clyde which, while withdrawn by them, were actually redistributed among the three brothers in proportion to their stock ownership, was a patently fraudulent scheme to substantially reduce its taxable income during all of the years in issue. The distinguishing characteristic of our whole system of personal income taxation is that it rests on the voluntary compliance of many millions of taxpayers. Each is, in the first instance, his own assessor and collector. This privilege must and does carry with it the concomitant responsibility to deal fairly and honestly with the Government. As we said in Charles E. Mitchell, 32 B.T.A. 1093, 1128 (1935), modified 89 Fed. (2d) 873 (C.A. 2, 1937), revd. 303 U.S. 391(1938): "* * * [It is the responsibility] to make a full revelation and fair return of all income received and to claim no deductions not legally due. This responsibility is not properly discharged by resolving all doubts against the Government, or by giving effect to studied efforts to wipe out taxable income by secret and questionable practices. It is a maxim of our law that, in dealing with the *175 Government, taxpayers must turn square corners." Taxpayers meet that responsibility with varying degrees of exactitude. Some through negligence, inadvertence, or ignorance may fail to report correctly the amount of tax due. Others through faulty or misguided interpretation of the taxing acts may likewise fail. Others may make a studied effort to so conduct their affairs that a minimum of taxes will be due. Some, however, deliberately will not measure up to the full responsibility demanded of them. They vary, of course, from those who report some income but becloud their financial transactions with devices calculated to deceive, to those who flagrantly refuse to report any income. Often, the line of demarcation between honest avoidance and deliberate evasion is fine indeed. But, because of those who will not meet their full responsibility, the Code and previous Revenue Acts have provided penalties for the filing of fraudulent returns with intent to evade tax. The Government asserts the penalty and must prove by clear and convincing evidence that it should be imposed. Rarely, if ever, does all of the evidence point one way or the other. Most often, as here. the Commissioner's assertion *176 is met with vigorous protestations of innocence and numerous efforts to explain away sinister implications from the facts standing alone. Our duty, as the trier of the facts, is to sort "the real from the seeming." [3]
One fact of crucial importance which is plain above all other from this record is that Clifford McGehee was synonymous with Jacksonville Paper Company and all other enterprises in which the McGehee brothers were interested during the years before us. He, at all times, was in complete control of Jacksonville; and we are satisfied that the salaries authorized for him and his brothers were determined by him, and that it was he who conceived the plan by which Jacksonville claimed deductions for salaries which he never intended for it to pay to his two brothers and, in many years, to himself. From 1923 to 1938 (1928 not in issue), inclusive, Jacksonville deducted $385,653.30 for salaries paid to Matthew and Clyde. They failed to withdraw $180,722.81 of such salaries. During the same period, Clifford failed to withdraw $54,620.91 of the $232,133.30 of salary authorized for him. Matthew never withdrew more than *177 81 per cent of the salary authorized for him; and, in all but 5 years, he withdrew less than 60 per cent of the amount authorized. Clyde never withdrew more than 72 per cent of the salary authorized for him; and, in all but 4 of the years, he withdrew less than 50 per cent of the amount authorized. These undrawn amounts of salary were credited to the capital stock account on Jacksonville's books, and the three brothers received stock therefor which they held jointly. The ownership of that stock, however, as Clifford freely admitted, was not one-third each as one would suppose from the fact that it was jointly held; nor did Matthew and Clyde own the amounts of stock which were issued against their undrawn salaries, as, of course, became very clear upon the redistribution of the jointlyheld shares in 1938. At the end of that fiscal year, the jointlyheld stock was canceled and the shares actually owned by each brother reissued to him separately in the following ratio: Clifford
64%
Matthew
33%
Clyde
3% Upon such distribution, Clifford and his family (to whom he gave a part of his shares) received $512,000 of stock; Matthew and his wife (to whom he gave a part of *178 his shares) received $264,000 of stock; and Clyde received $24,000 of stock. (In addition to the so-called undrawn salaries, surplus and other income of the three brothers had been used to purchase the total $800,000 worth distributed in 1938). The petitioners deny none of the facts set forth in our findings with reference to the "undrawn" salaries for the years 1923 to 1938 and the redistribution by Matthew and Clyde of certain amounts of their salaries during the years 1939 to 1942. Clifford testified: "Each one could drawn every dime that was authorized, if he saw fit, and in some years that was done [only by him]. Some years more than that was drawn [only by him], but it was understood, if they did not draw all that was authorized at the end of the year, the residue would be used to purchase stock of Jacksonville Paper Company and that the stock would be issued on the original agreement, the basis of the ratio of the original investment of each of the three brothers. * * *
"* * * It wouldn't make any difference if he was authorized to draw 25 and drew 15; 15 was salary. The balance of that went to the pool. It wasn't his. If he failed to draw it, it wasn't his. It *179 belonged to all three of us. * * *" The petitioners argue that the plan was a perfectly valid one on the theory that the salaries, authorized and deducted by Jacksonville, were reasonable; and, in effect, that if such salaries were reasonable, it is of no concern to the Commissioner, insofar as determining deficiencies against Jacksonville is involved, what the three brothers did with the salaries thereafter. They point to a Memorandum Opinion of the Board of Tax Appeals, Docket Nos. 52296 and 66611, August 1, 1933, in which salaries authorized and deducted by Jacksonville for the three brothers for the years 1927 to 1930, inclusive, were held to be reasonable. They argue that salaries for all other years here in issue are reasonable by comparison. In addition, they introduced expert testimony into the record in support of their argument. The respondent has not attacked the reasonableness of the salaries authorized for any one of the three brothers, and the petitioners admit that "no claim is made that the salaries are excessive per se." Their arguments addressed to that question are obviously wholly irrelevant. What the respondent argues is that, reasonable or unreasonable, *180 salaries are deductible as a business expense by a corporation only if they are intended and paid as such. We agree. Section 214(a) of the Revenue Act of 1921, [4] and identical provisions in subsequent Acts and the Code, all permit a deduction for compensation to officers of a corporation by way of "a reasonable allowance for salaries or other compensation for personal services actually rendered". In Twin City Tile & Marble Co., 6 B.T.A. 1238, 1247 (1927), affd. 32 Fed. (2d) 229 (C.A. 8, 1929), we said: "* * * In order to be compensation for services, the value of the services must measure the amount and not stock ownership. Conceding for the sake of argument that the services of individuals in this case were fairly worth the amounts they received, this fact alone is not sufficient to constitute the amounts compensation. They must have been intended and paid as such." *181 In Harrington Co., 6 T.C. 720 (1946), we disallowed the deduction of additional amounts of salary where the recipients had agreed to contribute such sums to the corporation's surplus. In Albert W. Russel, 35 B.T.A. 602 (1937), we permitted only the amount of salary actually received by the corporation officer to be taxed to him, even though the corporation had authorized a sum twice as great. And, similarly, in Royal Mfg. Co. v. Commissioner, 139 Fed. (2d) 958 (C.A. 3, 1943), the corporation was not permitted to take a dividend credit for the amount of dividend checks endorsed and redeposited to the corporation's account. Pursued to its logical conclusion, of course, petitioner's argument would be tantamount to saying that a business organization should be entitled to deductions for any legitimate expenses, even though it never made expenditures, if the amounts thereof would have been reasonable if made. The invalidity of such an argument is apparent on its face. The vital question is: Did Jacksonville claim deductions for salaries with the knowledge that the full amounts thereof would not be paid to the three brothers, that Matthew and *182 Clyde would never receive stock or other property of value equivalent to the "undrawn" amount of their salaries, and with the intent of benefiting taxwise from such deduction? A corporation can, of course, act only through its officers. In determining fraudulent intent on its part, we look to the acts of its officers taken in its name and in its behalf. George M. Still, Inc., 19 T.C. 1072 (1953), on appeal C.A. 2, May 28, 1953; Saven Corporation, 45 B.T.A. 343 (1941). Jacksonville, through all of the years here in issue, paid no dividends. Whether that was because it needed large amounts of working capital at all times was not shown. Clifford, however, devised the scheme of salary deductions described to give the corporation the advantage of a tax deduction. If the undrawn amounts of Matthew's and Clyde's salaries during the years 1923 to 1938 had been used to purchase stock for them, we would have an entirely different situation before us. It is because the undrawn amounts of their salaries were used to purchase stock for Clifford that impels our conclusion *183 that Jacksonville, at the time the salaries for Matthew and Clyde were authorized each year, never intended that the total amounts so authorized and deducted on its returns would ever be paid to them. No explanation has been offered to show why the stock was jointly held until 1938. Matthew told the revenue agent that they just preferred to do it that way. Clifford indicated that Matthew did not want to be bothered with issuing individual certificates each year. We cannot accept either explanation. It is all too apparent that, by issuing jointly-held shares, the scheme for fraudulently deducting salaries which were never to be paid could better be covered up. During many of the years before us, there was no great difference in the amount of salary authorized for each brother. The record establishes beyond doubt, however, that Clifford was the dominant force in the corporation. We are satisfied that the amounts of salary actually withdrawn by each brother, whereby Clifford received more than twice as much as Clyde in most years, and substantially more than Matthew, more nearly reflect Clifford's true intent that the compensation received by him and his two brothers be in relation *184 to their importance in the company. We have before us a pattern of operation extending over many years - not isolated transactions of only one or two years. For 15 years Matthew and Clyde did not withdraw substantial amounts of their authorized salaries, and Clifford in most years failed to withdraw all which was authorized for him. We are satisfied that the deductions claimed by Jacksonville therefor were not taken under any erroneous understanding of the law nor with even some doubt as to their legality. The evidence before us is clear and convincing that the deductions were a fraudulent scheme to reduce the tax liability of the corporation. Any other conclusion would sanction a flagrant distortion of the accepted, every-day concept of what constitutes bona fide legal deductions for officers' compensation. The salaries authorized were never intended to be paid, and deductions for such salaries claimed by Jacksonville on its returns from 1923 to 1938 were fraudulent with intent to evade tax. Maggio Bros. Co., 6 T.C. 999 (1946); J. L. Norie, 3 T.C. 676 (1944), affd. sub nom. Coast Carton Co. v. Commissioner, 149 Fed. (2d) 739 (C.A. 9, *185 1945); Allegheny Amusement Co., 37 B.T.A. 12 (1938); Holmes & Janes, Inc., 30 B.T.A. 74 (1934); see also Lorraine Corporation, 33 B.T.A. 1158 (1936). Petitioners cite Cooke v. Commissioner, 203 Fed. (2d) 258 (C.A. 10, 1953), rehearing denied April 14, 1953, certiorari denied 346 U.S. 815 (1953), in support of their argument to the contrary. That case is distinguishable on its facts from the one before us here, most importantly because the employees there could have made withdrawals of the amounts credited on the books to them if they desired; and such amounts were, in fact, later used by them to purchase an interest in the business. The fraudulent nature of the salary deductions claimed by Jacksonville on its returns for the remaining 4 years, 1939 to 1942, is even plainer than in the earlier years. Coupled with Clifford's intent to fraudulently reduce the corporation's tax liability for those years was his equally fraudulent intent to reduce his personal tax liability. For these remaining years, Jacksonville deducted $99,833.34 for salaries paid to Clifford, all of which he withdrew. In each year he withdrew, *186 in fact, more than the amount of salary authorized. The total overdrawn during the 4-year period was $22,631.34. Jacksonville deducted $75,333.34 as salaries paid to Matthew during the 4-year period. He did not withdraw $17,095.32. Jacksonville deducted $62,666.67 as salaries paid to Clyde. He did not withdraw $18,093.40. At the end of each of those 4 years, Jacksonville issued checks to Matthew and Clyde for the amounts of their salaries not theretofore withdrawn. These were deposited in their personal bank accounts. The total amount was then redistributed among the three, approximately in proportion to their stock ownership in Jacksonville. Thus, of the total amount of Matthew's and Clyde's year-end salary checks of $35,188.72, Clifford received $27,832.48. Jacksonville claimed a deduction each year for the total amount of salaries authorized. Clifford reported only the amount of salary authorized for him. Both benefited materially from the excessive deductions and the understatements. The scheme was inherently fraudulent, and Jacksonville and Clifford are liable for the penalty asserted for filing fraudulent returns for those years. Maggio Bros. Co., supra; Holmes & Janes, Inc., supra. *187 In addition to their principal argument concerning the reasonableness of the salaries deducted, the petitioners have attempted to explain the distribution to Clifford of Matthew's and Clyde's year-end salary checks from 1939 to 1942 as being reimbursements to him for so-called "public relations" expenses which he incurred in behalf of Jacksonville. No explanation was offered as to why the distribution of the year-end salary checks should be in proportion to the three brothers' stock ownership. It is impossible for us to believe that had legitimate business expenses been incurred, Jacksonville, itself, would not have claimed them and taken a deduction therefor. Clifford testified that the "expenses" for which he was "reimbursed" were for wedding presents, flowers and entertainment of guests and customers at a hunting lodge which they maintained. He also testified: "I have made lots of contributions to political funds, substantial amounts, too, not five cent pieces. All of that I call public relations. I don't know what you call it, but I call it public relations". Whether any such expenses, even if incurred, could have been justified as proper business deductions is obviously *188 doubtful. We are satisfied that such expenditures either were not made or if made were fully compensated for otherwise, and that the whole scheme itself by which Clifford received the year-end payments from his brothers was inherently fraudulent. Running through petitioners' arguments are also frequent references to some knowledge, sufficient to constitute notice to the respondent, which they say he should have had for many years prior to the assertion of the fraud penalty, that the plan of salary distribution now challenged as fraudulent was in operation. We understand such references to notice to be arguments, although obliquely made, that (1) since the full facts of the plan of salary distribution were openly known for many years, that fact negates a fraudulent intent; and (2) even assuming the plan to be fraudulent, the fact that it has been known to the respondent for many years is sufficient to invoke the running of the statute of limitations against the imposition of deficiencies and penalties asserted by the deficiency notices here in issue. By way of supporting such arguments, the petitioners refer to the previous case before the Board of Tax Appeals, supra. They argue *189 that the plan of purchasing stock by crediting the undrawn amounts of the authorized salaries to the capital stock account each year was fully explained there. It is true, of course, that Clifford stated at that time that undrawn salaries were used to purchase stock. He also stated that the stock was equally owned - a statement which he repudiated during these proceedings. The salary issue in the previous case was confined to the reasonableness of salaries. We found them to be so. No issue with respect to the purchase of stock was raised, and we made no finding or holding thereon. In petitioners' brief are found such statements as: "information was, therefore, readily available to any revenue agent desiring to make an inspection"; and "From the lack of evidence to the contrary, it must be assumed that revenue agents making examination in those years [alleged inspections in 1925, 1926, and 1931] did not encounter any difficulty in obtaining access to the books and records of the company." We have found that the capital stock ledger sheet showing the 1922 ratios of ownership was not produced until long after the investigation, resulting in the deficiencies here in issue, had been *190 in progress. It did not become apparent to the revenue agents until the plan of salary distribution from 1939 to 1942 had been unravelled, that the plan in operation for the earlier years was likewise fraudulent. The returns for the earlier years noted that the stock was "jointly owned". The only ledger which we know was available began with Certificate No. 1, and showed the 3 qualifying shares in each brother's name and the remainder of the stock jointly held. Clifford had so testified before the Board. The brothers reported the full amounts of salaries authorized and deducted by the corporation; Clifford did not report the additional amounts which he received from Matthew and Clyde from 1939 to 1942, and they claimed no deductions for amounts paid to him as alleged reimbursements for expenses. Suffice it to say that the record demonstrates beyond question that the scheme as a whole was concealed. We find nothing in the record that mitigates against the inevitable conclusion drawn therefrom that the scheme through all of the years was pursued with a fraudulent intent to evade tax. As to petitioners' second argument concerning the running of the statute of limitations once the respondent *191 suspected or knew of fraud, we can imagine no more obstructive requirement which could be placed on the Commissioner than to sanction such a theory. Petitioners obviously do not and cannot cite any statutory provision nor judicial authority in support of their proposition. The Commissioner in the first instance must assert fraud, and carries the full burden throughout of so proving by clear and convincing evidence. It would seriously jeopardize his ability to fulfill his duty of asserting and proving fraud where it exists should we attempt to legislate a requirement that he must assert the penalty within some specific period of time or be barred from doing so because of the running of the statute. Respondent asserted the fraud penalty against Continental Distributing Company for the years 1939 to 1942, inclusive, on much the same grounds that he relied on in asserting the penalty against Jacksonville. He determined that Continental's deduction of a salary in each of those years paid to A. S. Reinoehl, its president, was claimed knowing that, in fact, it was a distribution of Continental's profits to the McGehee brothers. In addition, he determined that the amounts received by Clifford *192 and Matthew from Reinoehl were additional income to them and that their failure to report such sums was due to fraud with intent to evade tax. Clifford and Matthew concede that such sums should have been included in their reported income, but deny that their failure to do so was fraudulent. The record shows that in 1936 Jacksonville's brokerage business, theretofore carried on under the name of Continental Distributing Company, was incorporated under the same name. Despite petitioners' allegations to the contrary, we have found that Continental was at all times owned by the three McGehee brothers, and that its stockholders of record were only nominees for them. Funds provided by Clifford and Matthew constituted the entire paid-in capital of Continental; its bank account was subject only to the withdrawals of Clifford and Matthew; its designated manager was Matthew; Reinoehl knew nothing about the brokerage business and exercised no supervision over its only employee, Sparks Jones; Reinoehl rendered no services to Continental; Clifford was the actual manager of the business; its shareholders of record and its officers were all employed by Jacksonville; its stock certificates were *193 at all times retained in Jacksonville's safe; the McGehee brothers received absolutely nothing for the alleged transfer of the lucrative predecessor business to the stockholders of record; substantially all of its earnings were from brokerage fees on purchases of Jacksonville; all of its sales were made through Jacksonville outlets; its earned surplus and undivided profits were all loaned to Southern Industries and transferred by Southern Industries to Jacksonville; no changes in the operations of the business followed its incorporation; employees of Jacksonville rendered services to Continental without charge therefor; for 2 years Clifford and Jacksonville managed Continental without charge for their services; Clyde had no knowledge of any transfer of the business to Reinoehl and, at the time of the revenue agents' examinations thought that he still retained his interest therein; no dividends were paid to the stockholders of record prior to or during any of the years in issue; and the stockholders of record received absolutely no financial benefits from their purported interests in Continental during such years. Continental loaned its surplus to Southern Industries at 4 per cent, *194 when Reinoehl owed banks and was paying 6 to 8 per cent on such loans. During each of the 4 years from 1939 to 1942, inclusive, a salary of $1,200 per year was authorized for Reinoehl. Upon receipt of a check for this sum (less deduction for Social Security taxes) each year, he deposited the check in his personal bank account and thereupon drew checks, totaling the full amount of his salary, payable to Clifford, Matthew, and Clyde in proportion to their stock ownership in Jacksonville. Continental claimed a deduction for salary paid to Reinoehl on its returns each year. The McGehee brothers did not report the amounts received from Reinoehl on their returns. The distributions by Reinoehl occurred on the same day in each of the years on which Clyde and Matthew disbursed their year-end Jacksonville salary checks to Clifford. Sums in the amount of Reinoehl's tax liability each year, because of the Continental salary paid to him, were paid to him from some undisclosed source. Here again, the petitioners advance the argument that the salary paid to Reinoehl was reasonable and, hence, was an allowable deduction by the corporation, even though ultimately paid to the three brothers. We *195 previously repudiated an identical argument made with respect to salary deductions claimed by Jacksonville. We think it convincingly clear that the salary paid and claimed as a deduction by Continental was intended as a means of fraudulently reducing its taxable income and as a method of channeling some of its profits into the hands of the McGehee brothers - free of tax. Through deductions for "Administrative Expense" of $2,700 each year and Reinoehl's salary of $1,200, the McGehees managed to siphon off almost $4,000 of its profits each year. The remainder went in loans to Southern Industries, which paid the proceeds to Jacksonville. Such loans were never repaid during the years in question either by Jacksonville or Southern Industries. It is impossible for us to believe Clifford's explanation that payments by Reinoehl to him and to Matthew were for services. Book adjustments were made between Continental and Jacksonville to provide for the payment for Matthew's alleged services to Continental in the amount of $225 each month. Matthew was critically ill during 1939, and there is no evidence showing he performed services for Continental. If the payments were for business expenses *196 and services. Continental could have and should have claimed them itself. The only explanation offered as to why payments were in proportion to stock ownership was that that ratio just seemed a convenient one. Reinoehl's testimony to revenue agents during the course of the investigation with reference to the salary payments and during the trial was vague and contradictory. We cannot accord it any credibility. After the revenue agents had begun their investigation, Reinoehl executed a $1,000 note payable to Clifford and Matthew. In attempting to explain the $1,000 note, Reinoehl said he had borrowed that sum from Clifford and Matthew to purchase Continental with. The two brothers said they did not sell Continental, and that the note was in repayment of the $1,000 they originally advanced to Continental. Reinoehl also, at one time, testified that a part of the payments to Clifford, Matthew, and Clyde was interest. He took no deduction, however, for interest payments. The note was executed only after revenue agents had begun their investigation, and we are satisfied their investigation prompted its execution in an attempt to give substance to Continental's alleged ownership by Reinoehl. *197 The respondent asserted the fraud penalty against Clifford for the years 1939 to 1942, inclusive, and against Matthew for the years 1939 to 1941, inclusive, on the ground that they fraudulently failed to report the payments received from Reinoehl in each of those years. They conceded on brief that the amounts received from Reinoehl were income to them and should have been so reported. With respect to Clifford, we are satisfied that his failure to so report such sums was fraudulent with intent to evade tax. With respect to Matthew, however, there appears to be a deficiency in reported income only for 1939, and we agree with respondent that his failure to so report such sum was fraudulent with intent to evade tax for that year. In his deficiency notice in Docket No. 14885, respondent made allowance for the amount of year-end salary checks received from Jacksonville from 1939 to 1941 which Matthew reported and on which he paid tax. The amount reported in 1940 and 1941 exceeds the net amount of the Jacksonville year-end salaries actually retained by Matthew plus the amount which he received from Reinoehl. Since there are no deficiencies applicable with respect to the original returns *198 for these 2 years, the penalty for fraud is not upheld. In upholding the respondent's assertion of the fraud penalty against Continental, we rejected the only argument offered here in explanation of why Clifford and Matthew did not report the amounts received from Reinoehl; namely, that the amounts paid to them were for services. The whole record here makes it impossible for us to accept that uncorroborated testimony. In the deficiency notice accompanying the petition in Docket No. 106498, the respondent added the following amounts to Clifford's income for the years 1936 to 1938, inclusive: Year
Salaries
1936
$ 3,990.84
1937
9,251.90
1938
5,425.23 Respondent determined that such sums were the undrawn amounts of Matthew's and Clyde's salaries against which stock was issued to Clifford, and that those amounts were additional compensation to him. The 50 per cent penalty for fraud was not asserted because of such additions either in the original deficiency notice, in any answer to the petition, or in the amended answer thereto; and respondent did not discuss the fraud penalty in connection with such addition on his original brief. The petitioners indicate *199 on brief, however, their understanding that assertion of the fraud penalty is predicated on these additions to income, and the respondent in his reply brief states: "It is submitted that the Court should find that Clifford fraudulently failed to report the receipt of taxable income from the Jacksonville Paper Company through Matthew and Clyde on each of his returns filed for the taxable years 1936 to 1942, inclusive." On the closing day of the trial in these proceedings, we granted respondent's motion to conform the pleadings to the proof offered. No further amended answer, however, has been received; and we, therefore, do not understand that the respondent, irrespective of language in his reply brief to the contrary, has asserted the fraud penalty with respect to such adjustments. Moreover, it seems clear to us that the amounts of Matthew's and Clyde's undrawn salaries, resulting in the issuance of additional capital stock to him in proportion to his original holdings, are in the nature of a stock dividend and, hence, not taxable, pursuant to section 115 (f) (1) of the Revenue Act of 1936. [5] There was no election to take the amount of undrawn salaries in any form other than *200 stock, and each brother actually received stock in proportion to his original ownership upon the distribution of the jointly-held shares in 1938. Eisner v. Macomber, 252 U.S. 189 (1920). The petitioners advanced one further argument against the respondent's assertion of the fraud penalty against any of them; namely, "the taxpayer's general integrity and whether he is a person of large affairs". They argue that the McGehee brothers were well known and respected citizens of their community, and that the pressure of numerous business problems, particularly on Clifford, during all of the years in issue was great; they admit that he may have been negligent in observing the strict requirements of the law. Rightly or *201 wrongly, there is perhaps a disposition to believe that one who earns his income from a lawless occupation or one who operates on the fringe of legality is apt to be intentionally lax in cutting square corners, taxwise, with the Government. Conversely, there is a similar disposition to believe that not only a man of "large affairs" but any taxpayer who is to all outward appearances an honest and correct citizen of the community will not willfully defraud the Treasury. But be that as it may, the deductions claimed and the failures to report income received, which the respondent here attacks as fraudulent, are evidence of schemes which to us are inherently fraudulent. Clifford McGehee, as the success of his enterprises attests, was a man of intelligence and outstanding business ability. Ignorance of the law is not an excuse available to him; nor, is negligence. His failure to report income received from his brothers and Reinoehl was not that it was "overlooked"; he, purposely, never intended to report it. He has failed, and through him Jacksonville and Continental also failed to meet the minimum standards required of every taxpayer to deal frankly and honestly with the Government. *202 Opinion Issue 9 Continental Distributing Company - A Partnership We have hereinbefore held that Jacksonville's returns for all of the years here in issue were fraudulently filed with intent to evade tax. Thus, the statute of limitation is not a bar to additions to its income for years prior to June 30, 1936. The respondent determined the Continental Distributing Company was not a valid partnership, and that income received from brokerage commissions earned in that name for each of the fiscal years ended June 30, 1934, 1935, and 1936, should be added to Jacksonville's income for such years. Essential to recognition of a partnership for tax purposes is the intent on the part of the alleged partners to form such a business entity. Commissioner v. Culbertson, 337 U.S. 733 (1949). The necessity for such an intent and that it be for a bona fide business purpose is particularly obvious where major stockholders of a corporation attempt to detach a part of the corporate business and conduct it as a partnership. See R.O.H. Hill, Inc., 9 T.C. 153 (1947); Forcum-James Co., 7 T.C. 1195 (1946). The facts previously set forth in our findings *203 show beyond any doubt that there was no intent to form a partnership to conduct the brokerage business in the name of Continental. The only purpose present was to report brokerage income on the brothers' individual returns so as to avoid possible prosecution of Jacksonville for violation of the National Industrial Recovery Act. The brothers did not even report Continental's income on their individual returns as "partnership" income, only as "other income". The respondent correctly added such brokerage income to Jacksonville's total income for the years 1934, 1935, and 1936. Findings of Fact Issues 10, 11, 12, 13, and 14 Southern Industries Company On August 15, 1936, a partnership agreement was executed whereby Clifford, Matthew, and Clyde associated themselves together as partners under the name of Southern Industries Company (hereinafter referred to as Southern Industries or the partnership) to engage in the manufacture and sale, at wholesale, of bags, envelopes, and other paper products, brooms, coat hangers, and other goods. The minutes of Jacksonville's directors' meetings show that, on June 16, 1936, its directors, Clifford, Matthew, and Clyde, began negotiations *204 with Southern Industries for the sale of the manufacturing department of Jacksonville, which manufactured paper bags, envelopes, coat hangers, and brooms. On August 15, 1936, Jacksonville executed a bill of sale, signed by Clifford as president and Matthew as secretary, transferring to Southern Industries all of the machinery and other equipment, together with an inventory of raw materials and manufactured goods located at its manufacturing plant at 14th and Walnut Streets, in the City of Jacksonville. The sale was to be effective as of July 1, 1936. The opening journal entry on the books of Southern Industries as of July 1, 1936, recorded the total assets transferred to it by Jacksonville at their book value of $143,456.10. This sum was carried on the books of Jacksonville and Sourthern Industries as an account receivable, and an account payable, respectively. Jacksonville also held a note of Soutern Industries, signed by Matthew and dated July 1, 1936, in the amount of $63,386.17 with interest at 3 per cent. This sum represented the net book value of the manufacturing equipment which Jacksonville sold to the partnership. The note was not entered on the books of either Jacksonville *205 or the partnership. No interest was paid or accrued on the note until 1940, after the investigation by respondent had commenced, when it was paid with the proceeds of a loan secured from the Barnett National Bank, hereinafter described. Clifford, Matthew, and Clyde made no capital contributions to the partnership upon its formation. During all the years here in question, the books of Southern Industries were maintained on the accrual basis for the fiscal years ending June 30, 1937, to June 30, 1939, inclusive, and May 31, 1940, to May 31, 1942, inclusive. Information returns, on Treasury Forms 1065, were filed on such basis. Upon the formation of Southern Industries in 1936, it was agreed that Jacksonville would continue to buy all raw materials needed in its manufacturing operations, and that such raw materials would be sold to the partnership at cost. It was further agreed that Southern Industries would sell its finished products to Jacksonville at current market prices, less 5 per cent, and an additional 5 per cent discount. In the early years of its existence, the partnership sold a small amount of its products to outside purchasers; thereafter, its total volume was sold *206 to Jacksonville. Southern Industries never owned any delivery equipment, and all shipments of raw materials to its plants and of manufactured products therefrom were made by trucks owned and operated by Jacksonville. Jacksonville also made disbursements and advances for the partnership which were charged to Southern Industries' account on Jacksonville's books. Such advances were for freight costs, insurance, equipment, and payroll advances. All ledgers and journals of Southern Industries were kept by Jacksonville's employees in Jacksonville's offices. No charges for such services were made by Jacksonville. Southern Industries' employees were included in a group insurance plan which covered all employees of Jacksonville, the master policy being in Jacksonville's name. No charges for the cost of such insurance were allocated to Southern Industries. During all of the years here in question, Southern Industries owed Jacksonville substantial sums which were reflected in its accounts payable at the end of each fiscal year, as follows: Date
Amount
July 1, 1936
$ 143,456.10
June 30, 1937
193,065.23
June 30, 1938
261,099.02
June 30, 1939
235,413.63
May 31, 1940
189,253.15
May 31, 1941
224,469.59
May 31, 1942
91,591.17
*207 Jacksonville executed a lease on its warehouse property under date of October 31, 1935, with the lease to be effective on November 5, 1935. The lease does not show any assignment to Southern Industries. Southern Industries occupied the premises under the lease in the name of the Jacksonville Paper Company. The lease on the present manufacturing plant at 23rd Street and Evergreen Avenue, Jacksonville, Florida, went into effect on September 1, 1939. The lease named Jacksonville as the lessee and showed no assignment to Southern Industries. The rental payments were made by Jacksonville's checks which were charged to Southern Industries' account. Casualty insurance carried by Jacksonville also covered all of the premises used by the partnership, and charges therefore were prorated quarterly to Southern Industries. The partnership maintained a bank account at the Barnett National Bank, which was opened on August 4, 1936. Clifford determined the prices at which all products manufactured by Southern Industries were sold. Paragraph 3 of the partnership agreement stated: "3. The interest of the parties hereto in said partnership shall be on the following percentages: C. G. McGehee
64.89%
M. R. McGehee
32.33%
C. C. McGehee
2.78%
*208 and each of the partners shall be entitled to participate in the partnership profits and shall contribute to the assets and capital of the partnership on the basis of such percentage." For the fiscal years ending June 30, 1937, and June 30, 1938, Southern Industries reported net distributable partnership income on its information returns as follows: 6/30/37 - $64,131.07; 6/30/38 - $35,645.21. Its profits for such years, except for minor amounts, were used to purchase Jacksonville's stock jointly held by the three brothers which was divided upon the distribution of such stock in 1938, as follows: 64 per cent to Clifford; 33 per cent to Matthew; and 3 per cent to Clyde. Although the partnership agreement provided for distribution of partnership profits in approximately the same ratio as their stock ownership in Jacksonville, Clifford, Matthew, and Clyde each reported one-third of the partnership profits on their individual Federal income tax returns filed on the calendar-year basis for the years 1937 and 1938, as follows: Year
Clifford
Matthew
Clyde
1937
$ 24,349.25 *
$ 19,890.91
$ 19,890.91
1938
3,517.61 **
3,517.61 **
11,881.73
*209 Internal revenue agents began an investigation of the taxpayers here before us on March 20, 1940. On March 23, 1940, the three brothers signed an agreement stating, "through inadvertence and inattention", the partnership agreement of August 15, 1936, has incorrectly set forth the respective partnership interests of the three brothers; and, pursuant to their real intent, they wished to affirm that each brother had a one-third interest in the partnership. On March 30, 1940, Southern Industries borrowed $75,000 from the Barnett National Bank. The note was signed by all of the partners, was endorsed by Clifford and Matthew, who at that time ostensibly were no longer partners, and Jacksonville subordinated $100,000 of its accounts receivable to such indebtedness of Southern Industries. The proceeds of the loan were paid by Southern Industries to Jacksonville and applied against its outstanding accounts payable shown on Jacksonville's books. On March 30, 1938, Clifford and Matthew each executed irrevocable assignments of "an undivided one-third (1/3) interest" in Southern Industries to their respective wives. On June 20, 1938, Clifford executed 6 irrevocable trust agreements transferring *210 to each of his children 250 shares of stock of Jacksonville Paper Company. His wife and his brother, Matthew, were trustees. Also, on June 20, 1938, Clyde executed 6 irrevocable assignments, each transferring an undivided 5 per cent interest in Southern Industries to Matthew and Ray Sutton McGehee, as trustees for each of Clifford's six children. On July 1, 1938, Ray Sutton McGehee transferred to herself and Matthew, as trustees for each of her six children, 6 undivided 3 per cent interests in Southern Industries. After the transfers above-described, proportionate interests in the partnership were held, as follows: Clyde C. McGehee
3 1/3%
Ray Sutton McGehee
15 1/3%
Delia C. McGehee
33 1/3%
Trustees for Clifford's 6 children
48 %
100 %
No Federal gift tax returns were filed by Clyde for any of the years here in question, nor did Clyde report a profit or loss on the six 5 per cent interests given to Clifford's children. Ray Sutton McGehee filed no gift tax returns for any year. Clifford and Matthew filed gift tax returns showing gifts to their wives; Clifford filed returns showing gifts of stock to the trusts. No partnership agreement was executed by Clyde, *211 his two brothers' wives, and Matthew, as trustee, after the transfers by Clifford and Matthew of their interests in the partnership. Ray Sutton McGehee and Delia C. McGehee knew nothing of the operation of the partnership; contributed no capital to it; rendered no services to it; had no business experience; and withdrew no money for their own use from their share of its income during the years 1938 to 1942, inclusive, when they were ostensible partners, except for the payment of income taxes. Clifford continued to direct the operation of the partnership just as he had done prior to the transfer of his and Matthew's interests in it. Respondent determined that Southern Industries was never a valid partnership, and that its income for all of the fiscal years ending June 30, 1937, to May 31, 1942, as follows, should be added to the income of Jacksonville: Year Ended
Amount
6/30/37
$ 59,673.74
6/30/38
35,645.21
6/30/39
60,649.59
5/31/40
85,705.06
5/31/41
83,121.66
5/31/42
182,839.94 In the alternative, he determined that Southern Industries was a valid partnership, but that the sale of Jacksonville's manufacturing equipment and inventories to it in 1936 *212 constituted a taxable dividend in the amount of $143,456.10 to the three McGehee brothers in proportion to their stockholdings in the corporation. The respondent further determined that the partnership's profits - for all years June 30, 1937, to May 31, 1942 (except 1938) - should have been reported by the three brothers in accordance with the partnership agreement of August 15, 1936, and that the alleged partnership between Ray Sutton McGehee, individually, as trustee with Matthew, with Delia C. McGehee, and Clyde was not a valid one. He further determined that Clifford's failure to report his full share of partnership income in 1937 and until March 30, 1938, was fraudulent with intent to evade tax. Southern Industries was a valid partnership consisting of Clifford, Matthew, and Clyde who held a 64.89 per cent, 32.33 per cent, and 2.78 per cent respective interest therein until March 30, 1938. Clifford's failure to report his full distributive share of partnership income prior thereto was due to fraud with intent to evade tax. The transfer by Jacksonville of certain of its assets to Southern Industries on its formation in 1936 was not a taxable dividend to the three McGehee brothers. *213 After March 30, 1938, Matthew owned no interest in the partnership, and after June 30, 1938, Clifford owned no interest therein. After that time, Southern Industries was a partnership consisting of Clyde, Delia C. McGehee, and Ray S. McGehee, individually and as trustee with Matthew. Opinion Issues 10, 11, 12, 13, and 14 Southern Industries Company Respondent's principal determination with respect to Southern Industries is that its income during all of the fiscal years, June 30, 1937, to May 31, 1942, was, in reality, the income of Jacksonville and should be accordingly so taxed. Respondent made his determination pursuant to sections 22 (a) of the Revenue Acts of 1936 and 1938 and the identical section of the Code, and not by reason of the broad authority given him under section 45 of the Revenue Acts of 1936 and 1938 and the identical section of the Code to reallocate income between different taxpayers. Respondent, in support of his determination, thus argues that Southern Industries was not a valid partnership but only a sham, devised by the McGehee brothers to siphon off a substantial part of Jacksonville's income during the years in question. The petitioners, on the *214 other hand, argue that Southern Industries was a valid partnership formed for a business purpose, and that its income during all of the years in question was reportable by the members of the partnership. We agree with petitioners' argument. There is no doubt in our minds that in 1936 Clifford McGehee, for sound business reasons, desired to split off the manufacturing operations which Jacksonville had theretofore carried on and form a separate and distinct business entity which would thereafter conduct those operations. To accomplish this purpose, he chose a partnership composed of himself, Matthew, and Clyde. A formal partnership agreement was executed by the three brothers setting forth the activities in which the partnership would engage and providing the ratio in which partnership profits would be distributed between them. A bill of sale was executed by Jacksonville transfering all of its manufacturing equipment and inventories used in its manufacturing operations to the partnership. Thereafter, Southern Industries set up its own books. The income from the manufacturing operations conducted by it was thereafter always reported on Treasury Form 1065, and taxes thereon were always *215 paid by each partner. Southern Industries maintained its own bank account and belonged to a number of paper manufacturers' trade associations. It was recognized by the Wage and Hour Division of the United States Department of Labor; it established and used trade names for its products. In the face of these outward appearances of a valid partnership, the respondent argues that, in fact, the manufacturing operations which Southern Industries carried on and the manner in which it did so differ in no material way from the manner in which Jacksonville had conducted its manufacturing activities prior to the formation of the partnership. Respondent points out that the manufacturing activities were always conducted at premises separate and apart from the plant and warehouse of Jacksonville's wholesale paper distributing business; that the books and records of the manufacturing operations were always kept separate from those of the wholesale paper distributing activities; and that Jacksonville employees continued to keep the partnership books. He argues that Clifford, Matthew, and Clyde made no contribution to the partnership's capital upon its formation, and vigorously denies the existence *216 of any bona fide business purpose which motivated the formation of the partnership citing Friedlander Corporation, 19 T.C. 1197 (1953), on appeal C.A. 5, September 23, 1953. He argues further that the note for $63,386.17 was not set up as a note receivable on the books of Jacksonville nor as a note payable on the books of Southern Industries, that the $75,000 loan which Southern Industries secured from the Barnett National Bank in 1940 was arranged for only after internal revenue agents had commenced an investigation. He argues that the close association of Southern Industries and Jacksonville completely negates the idea that any purpose other than the saving of taxes motivated the formation of the partnership, and that the fact that Southern Industries' profits were used to purchase Jacksonville's stock is further evidence that the partnership was only a sham. Clifford testified at some length with reference to the principal purpose which he and his brothers considered in forming the partnership. It was that a wholesale paper jobber could not successfully carry on large manufacturing activities in conjunction with its regular business; and, that by 1936, the manufacturing *217 operations of Jacksonville had grown to sizeable proportions. He indicated that the type of personnel employed in the manufacturing operations was totally different from that employed in the jobbing business; that the wage scales were different; and that potential difficulties were much more probable with the manufacturing employees than with the jobbing employees. The respondent argues that this explanation does not demonstrate a bona fide purpose in the absence of any substantiating evidence. He deprecates the sincerity of Clifford's belief that potential labor problems might arise with the manufacturing employees, and claims that Clifford's belief that wholesale paper jobbers should not carry on manufacturing activities was more fancied than real. Clifford's testimony on this issue had a convincing ring. His knowledge of those phases of the paper industry in which Jacksonville was engaged is beyond question; and we are convinced that he was sincere in his belief that Jacksonville should not carry on large manufacturing operations in conjunction with its principal activity, which was the jobbing of various paper products. Clifford denied that tax saving was a consideration in forming *218 the partnership. We are satisfied that it was not the prime objective which inspired the formation of Southern Industries. But even if it had been a major consideration, that does not vitiate an otherwise bona fide partnership. Friedlander Corporation, supra; Coca-Cola Bottling Co. of Sacramento, 17 T.C. 101 (1951), on appeal C.A. 9, April 28, 1953. Only if the facts show that the partnership's sole purpose was to "exalt artifice above reality", are we justified in disregarding its existence and the normal tax consequences which follow therefrom. See Gregory v. Helvering, 293 U.S. 465 (1935). In this case we have already found that Continental was not a bona fide partnership. A comparison of the facts there and here serves to point up the difference between real intent and lack thereof. The close alliance between Jacksonville and Southern Industries, which the respondent argues is such clear proof that the partnership was only a sham, seems to us to be no more than the expected relationship between a corporation and a partnership where the stockholders and partners are one and the same. We should not suppose that two such organizations would *219 deal with one another as complete strangers. The fact that they did not do so is not sufficient reason to ignore the existence of the partnership. Coca-Cola Bottling Co. of Sacramento, supra; Palm Beach Aero Corporation, 17 T.C. 1169 (1952); Twin Oaks Co. v. Commissioner, 183 Fed. (2d) 385 (C.A. 9, 1950); John L. Denning & Co. v. Commissioner, 180 Fed. (2d) 288 (C.A. 10, 1950); Buffalo Meter Co., 10 T.C. 83 (1948). It must also be remembered that in forming the partnership the three brothers sacrificed the limited liability which they had enjoyed under the corporation for the unlimited personal liability of partners. Twin Oaks Co. v. Commissioner, supra. The Friedlander case and other cases such as R.O.H. Hill, Inc., supra, and Forcum-James Co., supra, are distinguishable on their facts from the case here before us. In the Friedlander case, for instance, we noted that the stockholder and alleged partner chiefly responsible for the formation of the partnership testified, in effect, that taxation was the predominant motive for the creation of the partnership which succeeded *220 to a part of the corporation's business. Respondent's first alternative determination concerning Southern Industries is that the manufacturing equipment and inventories, which were transferred to it at book value of $143,456.10 by a bill of sale, in reality constituted a taxable dividend in that amount to Clifford, Matthew, and Clyde in proportion to their stockholdings in Jacksonville. In support of his determination, respondent argues that no capital was contributed to the partnership by the three brothers; that the note for $63,386.17 was not recorded on the books of either company; that it was, in fact, not paid until 4 years later; that interest was never accrued thereon; and that the subsequent bank loan which Southern Industries secured was guaranteed by Jacksonville through subordination of $100,000 of its accounts receivable as collateral. We do not agree with respondent's determination. The intent of the stockholders to repay the debt determines whether a transaction between them and the corporation is in fact a debt as appears and as claimed by them or whether it is in fact *221 a dividend. Their control of the corporation is not decisive. Carl L. White, 17 T.C. 1562 (1952). The evidence indicates that the three brothers intended to pay for the assets which were sold to Southern Industries out of its current profits thereafter earned. The total value of all the assets transferred to Southern Industries was set up as an account payable to Jacksonville, which explains why the note for $63,386.17 was not reflected on the books of either company. The note was merely additional security for a part of the total debt. The plan of operation between the 2 companies, as Clifford explained in some detail, necessitated open accounts payable and receivable on the books of both Jacksonville and Southern Industries, since Jacksonville was purchasing raw materials which the partnership used and was buying back the major part of its manufactured products. As Clifford explained it, "Southern Industries always owed Jacksonville and Jacksonville always owed Southern Industries". The debt here in question arose from a bona fide business transaction, and the respondent erred in asserting that the value of the assets transferred to Southern Industries constituted *222 a taxable dividend to the three McGehee brothers. See Gorman Lumber Sales Co., 12 T.C. 1184 (1949). The respondent's second alternative determination concerning the taxation of Southern Industries' income is that during all of the fiscal years June 30, 1936, to May 31, 1942, its income should have been reported by the three brothers as provided in the original partnership agreement of August 15, 1936. We are satisfied that that agreement reflected the true intent of the three brothers insofar as their proportionate interest in the partnership up to March 30, 1938, is concerned. This is true even in the face of their reporting of partnership income in equal thirds and even in view of the subsequent agreement executed on March 23, 1940. Most all of Southern Industries' income for the fiscal years ending June 30, 1937, and 1938, was used to purchase Jacksonville's stock for the three brothers. The petitioners have conceded that the distributable profits of the partnership so used from July 1, 1936, to March 30, 1938, should have been reported according to the original agreement, as follows: Clifford
64.89%
Matthew
32.33%
Clyde
2.78% rather than *223 one-third each, as the three brothers actually reported it on their individual returns. Clifford so testified. We are satisfied from all of the evidence that Clyde's purported gift of a 5 per cent interest to each of the 6 trusts for Clifford's children was to preserve consistency, since income had been reported equally by the three brothers. We are further convinced that the agreement signed in 1940 attempting to set aside the proportionate interests established in the original agreement was made for no other reason than to try to present a consistent picture to the investigating revenue agents. We have found as a fact that Clifford's failure to report his full 64.89 per cent interest of Southern Industries' income on his returns in 1937 and until March 31, 1938, was fraudulent with intent to evade tax. The evidence before us permits no other conclusion. Clifford admitted that the original 1936 agreement was not signed until 1939, but his repeated assertion that, even though signed, it did not reflect the real ratio of ownership is impossible for us to believe. The gifts to the trusts by Clyde rather than Clifford and the execution of the 1940 "agreement" were both part of a plan *224 by which Clifford sought to hide fraudulent conduct in earlier years. The respondent determined that Clifford's wife should report 33.33 per cent of partnership income from March 31, 1938, to June 30, 1938, and that Matthew's wife should report Matthew's share (according to the original 1936 agreement) of 32.33 per cent. For the period March 31, 1938, to June 30, 1938, respondent also determined that Clifford should have reported 31.56 per cent of the income and Clyde, 2.78 per cent. We shall presently set forth our reasons for upholding the validity of gifts by Clifford and Matthew to their wives and the validity of the respondent's adjustments for this 3-month period, that of the trusts and donations thereto. Suffice it to say, for purposes we regard the transfers by Clyde of a purported 5 per cent interest to each of the 6 trusts as though he had held the legal title to such interests for Clifford's benefit. We have already stated that we cannot accept Clifford's testimony that each brother held a one-third interest in the partnership prior to March 31, 1938. And thus, although Clifford on that date held a 64.89 per cent interest in the partnership, all he transferred to his *225 wife on March 31, 1938, was a full one-third interest in the partnership. Clyde did not make transfers to the trust until June 20, 1938. Therefore, on the basis of the evidence which we have before us, we uphold the respondent's determination as to the distribution of partnership income for the period March 31, 1938, to June 30, 1938. We turn next to the distribution of partnership income after June 30, 1938. Since the adoption of the 16th Amendment, this and other courts have repeatedly emphasized that the taxation of income must be a realistic and practical application of the Government's taxing authority. Landmark decisions have come as guides along the way to help us reach the right results. Respondent claims that a cardinal principle of taxation enunciated by one of those decisions [6] - that income is taxable to him who earns it - will be violated should we fail to tax Clifford and Matthew with the profits of Southern Industries after June 30, 1938, according to the original partnership agreement. A contrary result, he says, would ignore the real ownership and control of that income. In support of his determination, he challenges as a sham all transfers of partnership interests *226 whereby profits were distributed to anyone other than the three brothers. He attacks the validity of the trusts and the gifts to the wives, arguing that, because of the uninterrupted management which Clifford and Matthew continued to exercise over partnership affairs from June 30, 1938, to May 31, 1942, they were at all times the real owners of the income. In answer, the petitioners argue that the trusts and all assignments of partnership interests were valid, and that the fact that Clifford and Matthew continued to operate the partnership and exercised full managerial control of its business does not make them taxable on any part of its income once their economic interest in the partnership had ended. The question thus presented does not involve the much litigated problem of the usual family partnership. For, to all outward appearances, Clifford and Matthew retained no joint or part economic interest in the partnership through which they might exercise control over the whole. Simmons v. Commissioner, 164 Fed. (2d) 220 (C.A. 5, 1947). In Visintainer v. Commissioner, 187 Fed. (2d) 519, 522, 523 *227 (C.A. 10, 1951), certiorari denied 342 U.S. 858 (1951), the court stated: "* * * Ordinarily, the essential elements of a completed and effective gift for income tax purposes are a donor competent to make the gift, a clear and unmistakable intention on the part of the donor to make it, a donee capable of accepting the gift, a conveyance or transfer sufficient to vest legal title in the donee, without power of revocation at the will of the donor, and delivery to the donee of the corpus of the gift or of the most effectual means of commanding dominion of it. In order to be effective as a gift, the donor must do everything reasonably permitted by the nature of the property and the circumstances of the transaction in parting with all incidences of ownership. * * * "* * * once a gift inter vivos has been completed and title has passed to the donee, the fact that the donor subsequently has possession of the property as caretaker or manager does not affect the validity of the gift." * * * We conclude that just such a case is presented here. The evidence before us establishes, beyond *228 question, that valid and effective gifts were made by the petitioners. Clifford and Matthew intended to, and did, divest themselves of all ownership in the partnership and of all rights to income therefrom. Matthew was seriously ill in 1938, and desired to establish a separate estate for his wife. He talked with Clifford; and, thereafter, they both decided that separate estates should be established for their wives and for Clifford's children. In addition to the partnership interests transferred, they also gave substantial blocks of their Jacksonville stock to their wives, and Clifford established the trusts with such stock as their corpus. This was a perfectly plausible objective and negates the idea that avoidance of income taxes was the predominant motive behind the gifts. Willis H. Vance, 14 T.C. 1168 (1950); William S. Bein, 14 T.C. 1144 (1950). The gifts to the wives and to the trusts were irrevocable. Clifford retained the power to appoint trustees. Investment and sale of trust corpus could not be made without his written consent, and he reserved the right to vote any shares of Jacksonville stock held by the trustees. But, the distributable shares *229 of partnership income were reported by the donees each year, and were used by them to purchase Jacksonville stock which they held, and neither Clifford nor Matthew thereafter shared in partnership profits. It is quite true, of course, that transactions between members of a family must be subjected to careful scrutiny. Commissioner v. Culbertson, supra. For, what appears to be one thing on the surface is frequently quite another when artifical trappings are removed. However, transactions between members of a family need not follow some pattern of rigid formality in order to avoid sinister implications. It is only reasonable to expect that the normal relationship between a husband and wife, their children, and between brothers would be close and informal. Alexander v. Commissioner, 194 Fed. (2d) 921 (C.A. 5, 1952). Certainly no law prevents a taxpayer from making a valid gift of a partnership interest to his wife and children; and the fact that thereafter he acts as a manager of the partnership does not make him taxable for its income. Henson v. Commissioner, 174 Fed. (2d) 846 (C.A. 5, 1949); Willis H. Vance, supra.Even though *230 some evidence indicates that Clifford and Matthew had drawing accounts on Southern Industries' books, the fact that they should thus be compensated for their services is not incompatible with the idea that they made full, complete, and bona fide gifts to their wives of their interests in the partnership. We have not hesitated, of course, to disregard outward appearances where the facts demonstrate clearly that alleged gifts were only a subterfuge and left in the donor the real control of income. Yiannias v. Commissioner, 180 Fed. (2d) 115 (C.A. 8, 1950), affirming Memorandum Opinion of this Court, Docket No. 15766, entered May 11, 1949 [8 TCM 457,]; Lyman A. Stanton, 14 T.C. 217 (1950), aff'd 189 Fed. (2d) 297 (C.A. 7, 1951); Elwin S. Bentley, 14 T.C. 228 (1950), aff'd 184 Fed. (2d) 668 (C.A. 2, 1950), certiorari denied 340 U.S. 943 (1951); Robert E. Werner, 7 T.C. 39 (1946). But we do not perceive that violence is done to the Lucas v. Earl doctrine by recognizing the gifts here in question as, in fact, what they appear to be. Findings of Fact Issue 15 Salary Payments *231 to Ray Sutton McGehee from Southern Industries In March and April 1938, Clifford applied for and was issued policies by the following insurance companies, in the following amounts: Name of Company
Policy No.
Face Amount
John Hancock Mutual Life Insurance Co.
3081141
$ 25,000
3093866
25,000
Prudential Insurance Co. of America
10187602
50,000
10228411
25,000
Metropolitan Life Insurance Company
6832475C
25,000
6832476C
25,000
Total
$ 175,000 Also, in April 1938, Jacksonville applied for and was issued the following policy on Clifford's life: Policy No.
Face Amount
Prudential Insurance Co. of America
10187605
$ 25,000 This policy was assigned to Ray Sutton McGehee by a resolution of Jacksonville's board of directors on July 17, 1939. In April of 1939, Clifford attempted to have the companies issue new policies with the same provisions as the originals, but with new applications attached to them showing his wife and Matthew, as trustees for his six children, as the applicants. His request was refused. Clifford was also unsuccessful in attempting to have the companies change the date of transfer of ownership, and *232 back-date changes of the beneficiaries. In April 1939, Clifford assigned all of his interests, rights, benefits, and privileges in the two John Hancock policies and the three Prudential policies to his wife, Ray Sutton McGehee. A similar assignment was made to her of the Metropolitan policies in August 1939. The amount of the premium paid on those policies in May 1939 was $2,293. Premium payments in 1939 on all of the policies were made in May of that year. Clifford paid the first premium on the policies from his personal funds. Subsequent premiums were paid by his wife from funds withdrawn from Southern Industries by her and charged as "salary" on the partnership books, in the amount of $8,500 in 1939 and 1940, and $8,000 in 1941 and 1942. A bank account was opened for her for that purpose. In 2 of the years, the amount withdrawn from Southern Industries exceeded the amount of the premiums, and the small balance was paid by her to Clifford. Her so-called "salary" in the amount of $8,500 in 1939 was paid by a check of Jacksonville in that amount. Set forth below is a summary of salary checks issued to Ray Sutton McGehee, checks drawn by her to pay premiums on Clifford's insurance, *233 and checks drawn by her to remit the balance of her unused salary check to Clifford: Deposits:
1939
1940
1941
1942
Salary check
$ 8,500.00
$ 8,500.00
$ 8,000.00
$ 8,000.00
Unidentified item
50.00
$ 8,550.00
$ 8,500.00
$ 8,000.00
$ 8,000.00
Premium checks to: John Hancock Ins. Co.
$ 2,323.50
$ 2,095.00
$ 2,083.50
$ 2,072.00
Metropolitan Ins. Co.
2,293.00
2,293.00
1,927.50
1,873.50
Prudential Ins. Co.
1,966.50
3,933.00
3,938.00
3,956.00
Prudential Ins. Co.
1,966.50
$ 8,549.50
$ 8,321.00
$ 7,949.00
$ 7,901.50
Remainder to
Clifford McGehee by check $ $ 179.00 $ $ 98.50
Undisbursed
.50
51.00
$ 8,500.00
$ 8,500.00
$ 8,000.00
$ 8,000.00
Respondent determined that the salary payments to Ray Sutton McGehee were taxable income to Clifford, and that his failure to so report such sums was fraudulent with intent to evade tax. Opinion Issue 15 Salary Payments to Ray Sutton McGehee from Southern Industries The respondent added to Clifford's income for each of the years 1939 and 1940 the sum of $8,500, and for each of the years 1941 and 1942 the sum of $8,000. These amounts were withdrawn from Southern *234 Industries by Ray Sutton McGehee as "salary" in each of those years and were used to pay premiums on the 7 life insurance policies issued on Clifford's life in 1938. Respondent determined that these premium payments constituted income to Clifford for his services to Southern Industries during those years. It is elementary, of course, that obligations of a taxpayer paid by another constitute income to him unless such payments are a gift. In answer to the respondent's determination, the petitioners argue that this addition to Clifford's income depends entirely upon the validity of the transfer of his partnership interest to his wife. We disagree. Clifford was unquestionably the manager of Southern Industries during the years in question; and, while there was no formal, written agreement between him and the partners that he would be compensated for his services, any payments from partnership funds made in his behalf, we would presume to be compensation for such services. Prudential Policy No. 10187605 was applied for and issued to Jacksonville and was never owned by Clifford. Premium payments thereon, regardless by whom made, could not constitute taxable income to him. The remaining *235 policies on which the premiums in question were paid were issued to Clifford by April of 1938. We have found that in April of the following year he assigned all of his interests, benefits, rights, and privileges, under the 2 policies issued by John Hancock and the 2 policies issued by Prudential, to his wife. Upon that assignment, she became the complete and full owner of the policies. A similar assignment was made to her of the Metropolitan policies in August 1939. Annual premiums on all of the policies were paid by her in May 1939 with funds which she received, as alleged salary, from Southern Industries. At the time the premiums were paid on the John Hancock and Prudential policies, Clifford was no longer their owner; and, hence, those and subsequent premium payments on those policies cannot be said to have been made for his benefit; and the amounts thereof do not constitute taxable income to him for any of the years, 1939 to 1942, inclusive. However, at the time the premiums were paid on the Metropolitan policies in 1939, he was still their owner. Premium payments thereon in the amount of $2,293 paid with funds received from Southern Industries by his wife, Ray Sutton McGehee, *236 constitute taxable income to him in that year in the nature of compensation for his services to the partnership. Frank D. Yuengling, 27 B.T.A. 782 (1933), affd. 69 Fed. (2d) 971 (C.A. 3, 1934); George Matthew Adams, 18 B.T.A. 381 (1929). Premium payments on the Metropolitan policies in subsequent years, when Clifford was no longer their owner, do not constitute taxable income to him. The respondent also asserted that deficiencies in Clifford's tax from adjustments made by adding the amount withdrawn by Ray Sutton McGehee, as salary from Southern Industries, were due to fraud with intent to evade tax, No part of the so-called "salary" paid to his wife will be added, except 1939; and the respondent has offered inadequate proof that Clifford's failure to include the amount of premiums paid by his wife on his Metropolitan policies in that year was due to fraud with intent to evade tax. Findings of Fact Issue 16 Clifford G. McGehee - Rental Income and Gain on the Sale of Rental Property Clifford filed his Federal income tax returns for all of the years here in issue on the calendar-year basis. In 1925, he built a house at 3510 Oak *237 Street, in Jacksonville, for his personal residence. The house was converted to rental property on June 24, 1930. Its fair-market value on that date was $9,750. Clifford reported no rental income from this property on his returns from 1930 to 1941, inclusive. On his return for the year 1942, he reported net rental income on this property of $210, determined as follows: Gross rental
$ 760.00
Less: Depreciation
450.00
$ 310.00
Repairs
100.00
$ 210.00
Depreciation was computed on an $18,000 basis, and an estimated life of 40 years. On his returns for all of the years, 1934 to 1942, inclusive, he deducted interest paid on a mortgage on the Oak Street property. On May 17, 1933, Clifford, through fore-closure on a mortgage, acquired title to a brick apartment house at 38 East 16th Street in Jacksonville. Its fair-market value on that date was $7,000. His basis for tax purposes was $8,057.81, computed as follows: Balance due on mortgage foreclosed
$ 1,122.31
Abstract
48.00
Attorney fees
250.00
Special Master's fee
35.00
Clerk's cost
27.25
Sheriff's costs
13.25
Publication of Notice of Sale
12.00
First mortgage
7,000.00
$ 8,507.81
Fair-market value of two lots
450.00
Basis of property for tax
purposes
$ 8,057.81
*238 On his returns for 1933 to 1940, inclusive, and for 1942, he reported no rental income from this property. On his return for the year 1941, he reported net rental receipts from the property of $578.14, determined as follows: Gross rental
$ 1,168.69
Repairs
$ 187.54
Commissions
93.01
280.55
$ 888.14
Depreciation
310.00
$ 578.14
Depreciation was computed on a basis of $7,750 and an estimated life of 25 years. On his returns for all of the years, from 1934 to 1942, inclusive, Clifford deducted interest paid on mortgages on the East 16th Street property. This property was sold in 1942 for $8,075. Clifford did not report the sale on his return for that year. Tucker Brothers, Inc., a Jacksonville real estate firm, acted as agent for Clifford in the rental of the East 16th Street property, and in some years of the Oak Street property. The firm of J. Glover Taylor, Inc., was rental agent for the Oak Street property from September 1939 to December 1942. These firms remitted the following net rentals to Clifford by monthly statements during the years indicated: Tucker Bros.,
J. Glover Taylor,
Year
Inc.
Inc.
Total
1933
$ 349.98
$ 349.98
1934
961.91
961.91
1935
1,316.02
1,316.02
1936
1,418.20
1,418.20
1937
1,732.49
1,732.49
1938
1,018.87
1,018.87
1939
857.40
$ 303.00
1,160.40
1940
1,013.73
904.50
1,918.23
1941
895.51
228.00
1,123.51
1942
342.40
725.21
1,067.61
*239 The respondent determined that Clifford received net rental income, not reported on his returns, as follows: 1936
$ 985.70
1937
1,307.07
1938
593.45
1939
418.33
1940
1,497.01
1941
9.15
1942
524.99 He further determined that Clifford's failure to report rental income was due to fraud with intent to evade tax. Respondent also determined that Clifford realized a net long-term capital gain of $750.79 on the sale of the East 16th Street property in 1942. Clifford's failure to report rental income from 1936 to 1942, inclusive, was due to fraud with intent to evade tax. Opinion Issue 16 In answer to respondent's determination that he received but did not report rental income from 1936 to 1942, inclusive, Clifford testified that he believed he had not received any net rental income which he did not report because allowable depreciation, taxes, insurance, and other costs offset the rents received. We cannot accept that explanation. The reason is obvious. If Clifford's explanation were correct, it would mean that there were no tax consequences from his standpoint or the Government's because of his failure to report rental income. That, of coure, is *240 not the case. He very carefully deducted interest on mortgage payments on the 2 pieces of property during all of the years in question and derived a definite tax benefit therefrom. The picture here is similar to the pattern of his failure to report the income received from other sources. We are satisfied that his failure to report his rents was a deliberately fraudulent attempt to conceal income and to claim deductions which should have been offset against such unreported income. What we said in M. Rea Gano, 19 B.T.A. 518, 533 (1930), is particularly appropriate here: "Isolated instances of discrepancy or occasional lapses from the rigid accountability contemplated by the law might conceivably be overlooked, but where the whole fabric of petitioner's tax accounting is permeated with gross error, where elaborate artifice is employed to accomplish the end sought, where the evidence adduced in explanation on different occasions varies so as to make it all unreliable, where sworn statements are proven by records to be false, and where the errors both of law and of fact all tend to accomplish a reduction of apparent tax liability, the situation goes beyond mere fortuitous *241 coincidence, or unintentional error. * * *" Clifford offered no evidence sufficient to warrant an adjustment in the amount of rental income which the respondent determined he received and failed to report. That determination is, therefore, upheld. As to the basis for the East 16th Street property, Clifford, in answer to the question of how much that property cost him, stated: "* * * we have a material lien $500, second lien $1,000, first mortgage $7,000, attorneys' fees $500, the millworks bill which was the bill I was trying to salvage, $2,000. The lumber bill which I believe was Putnam Lumber Company $1,500, and I paid a balance on a bank note of $1600, a total of $14,100 was the cost of the thing to me finally." The record is barren of any other evidence from which we might compute a basis for the property different from our findings, and pursuant thereto we uphold the respondent's determination that the basis of that property for tax purposes was $8,057.81, and that the net long-term gain realized on its sale in 1942 was $750.79. Such sum should have been reported by Clifford on his return for 1942. Findings of Fact Issue 17 Jacksonville Paper Company - Income for *242 Services Rendered to the J. P. Realty Co. In the deficiency notice, which is the basis of the petition in Docket No. 14884, the respondent added to Jacksonville's income the following amounts which he determined represented the value of overhead expenses and services rendered by Jacksonville to the J. P. Realty Co., a family corporation owned by the McGehees: Fiscal Year Ended
Amount
5/31/40
$ 550.00
5/31/41
600.00
5/31/42
600.00
The only evidence offered with respect to such adjustment was testimony by A. S. Reinoehl, Jacksonville's bookkeeper, that he had done all of the bookkeeping work for J. P. Realty Co. himself and that the total time spent in handling such work amounted to about one-half a day, once a year. Opinion Issue 17 The respondent offered no evidence in support of his determination. Meager as the petitioner's evidence on this point is, we think it was sufficient to require the respondent to come forward with some additional evidence to support his determination. As the record stands, this appears to us to be an arbitrary adjustment based on fine concepts of cost accounting. Obviously, the McGehees did not follow accounting methods *243 designed to best reflect the true amount of their income. Employees were, in reality, often working on a number of McGehee enterprises; but absent some showing that a real distortion of true income between Jacksonville and J. P. Realty Co. has occurred, we think the respondent's addition here is unjustified. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings have been consolidated: ↩
Petitioner
Docket No.
Year Ended
Jacksonville Paper Company
14884
7/31/23 to 7/31/25, inclusive
6/30/26 to 6/30/27, inclusive
6/30/29 to 6/30/36, inclusive
5/31/40 to 5/31/42, inclusive
106497
6/30/37 to 6/30/39, inclusive
Continental Distributing Company
14894
6/30/39 to 6/30/42, inclusive
Clifford G. McGehee
106498
12/31/36 to 12/31/39, inclusive
14893
12/31/40 to 12/31/42, inclusive
Matthew R. McGehee
106499
12/31/36 & 12/31/38
14885
12/31/39 to 12/31/41, inclusive
Clyde C. McGehee
106500
12/31/36
*. Both tax and penalty adjusted by amended answer.↩
*. Both tax and penalty adjusted by amended answer.↩
*. The sum of Columns B and C is $1.00 more than the total shown in Column A. No explanation is given for this error in the record. ** The corporation's books show total credits to the capital stock account from the brothers' salary accounts in the respective amounts of $16,500 and $15,000 for 1923 and 1924 for the issuance of stock. No breakdown between each brother for these 2 years is shown thereon.↩
*. The corporation's books show total credits to the capital stock account from the brothers' salary accounts of these amounts for the issuance of stock. No breakdown between each brother for these 2 years is shown thereon.↩
*. Clifford received the amount of his overdrawn salary $7,917.48 plus 64 per cent of the remainder distributed - $3,467.94; Matthew received 33 per cent of the remainder; and Clyde received 3 per cent.↩
1. 48 Stat. 195.↩
2. 49 Stat. 1526.↩
*. Reinoehl retained $145.43 - the approximate amount of his total Federal income tax for this year.↩
3. Charles E. Mitchell, supra, p. 1129↩.
4. Revenue Act of 1921. DEDUCTIONS ALLOWED INDIVIDUALS. SEC. 214 (a) That in computing net income there shall be allowed as deductions: (1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩
5. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (f) Stock Dividends. - (1) General Rule. - A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution↩.
*. Includes salary of $4,458.33 paid to Clifford. ** Clifford and Matthew allegedly disposed of all of their interests in the partnership on March 30, 1938. They reported no partnership income after that date.↩
6. Lucas v. Earl, 281 U.S. 111↩ (1930).